CONFEDERATED TRIBES OF the COL-
VILLE INDIAN RESERVATION, Lum-
mi Indian Tribe and Makah Indian
Tribe, Plaintiffs,

v.

STATE OF WASHINGTON, Charles
Hodde, Individually and as Director of
the State of Washington Department of
Revenue, Jack G. Nelson, Individually
and as Director of the State of Wash-
ington Department of Motor Vehicles,
and Robert S. O'Brien, Individually and
as Washington State Treasurer, Defend-
ants.

UNITED STATES of America, Plaintiff,

v.

STATE OF WASHINGTON, Defendant,

Confederated Bands & Tribes of the
Yakima Indian Nation,
Intervenor-Plaintiff.

Nos. 3868 and 3909.

United States District Court,
E. D. Washington.

Feb. 22, 1978.

Robert L. Pirtle, Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Seattle, Wash., for plaintiffs in No. 3868.

Slade Gorton, Atty. Gen. for the State of Washington, Matthew J. Coyle, Asst. Atty. Gen., Olympia, Wash., for defendants.

Dean C. Smith, U. S. Atty., Spokane, Wash., for plaintiff in No. 3909.

James B. Hovis, Hovis, Cockrill & Roy, Yakima, Wash., for intervenor-plaintiff.

## CONSOLIDATED DECISION

Before KILKENNY, Circuit Judge, and EAST and TURRENTINE, District Judges.*

EAST, District Judge:

These causes, Nos. 3868 and 3909, were by stipulation of the parties consolidated for hearing and submitted to the Court on their respective merits following oral argument at Seattle, Washington on March 28, 1977.

## CAUSE NO. 3868

*PARTIES* :

The plaintiffs are Confederated Tribes of the Colville Indian Reservation, Lummi Indian Tribe, and Makah Indian Tribe (Tribes).

---

* Originally the statutory three-judge District Court hearing the above was comprised, pursuant to the designation of Chief Judge Richard H. Chambers for the Ninth Circuit under date of June 20, 1973, of the Honorable John F. Kilkenny, Senior U.S. Circuit Judge for the Ninth Circuit, William G. East, Senior U.S. District Judge for the District of Oregon, and Charles L. Powell, Senior U.S. District Judge for the Eastern District of Washington. Thereafter pursuant to the designation of Chief Judge Richard H. Chambers for the Ninth Circuit under date of May 10, 1974, the composition of the statutory three-judge District Court herein was redesignated by the designation and appointment of the Honorable Howard B. Turrentine, U.S. District Judge for the Southern District of California, in lieu of the Honorable Charles L. Powell, and the redesignation and appointment of the Honorable John F. Kilkenny and the Honorable William G. East.

The defendants are the State of Washington; Charles Hodde, Director, Department of Revenue, State of Washington; Jack G. Nelson, Director, Department of Motor Vehicles, State of Washington; and Robert S. O'Brien, Treasurer, State of Washington (State).

*JURISDICTION :*

We note jurisdiction of these causes pursuant to 28 U.S.C. § 1362, 28 U.S.C. §§ 2201 and 2202, and 28 U.S.C. § 2281.[1]

*HISTORY OF PROCEEDINGS :*

This action was commenced on May 17, 1973, and District Judge Powell on November 5, 1973, in conformity with 28 U.S.C. § 2284, issued a temporary restraining order enjoining the State from enforcing its cigarette and tobacco products taxes against the Tribes. By stipulation, the parties agreed to the continuance of the restraining order pending review by the full three-judge District Court. On September 6, 1974, the full Court converted the temporary restraining order into a preliminary injunction. During the ensuing months, discovery proceeded until this Court stayed further proceedings pending the Supreme Court's decisions in *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), and *Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). Following the Supreme Court's disposition of those cases and after extensive discovery proceedings and briefing, the causes with the issues refined were submitted for decision upon stipulated facts as supplemented by deposition testimony and affidavits.

*THE TRIBES' CAUSE :*

The Tribes now seek declaratory relief, with injunctive enforcement, from the State's statutes·and administrative regulations imposing taxes and collection procedures upon on-reservation sales to nonmembers of the Tribes by tribally licensed retailers (Dealers) of cigarettes (R.C.W. 82.24) and tobacco products (R.C.W. 82.26), and from the State's statutes and administrative regulations imposing taxes upon motor vehicles (R.C.W. 82.44) and mobile homes, travel trailers and campers (R.C.W. 82.50) owned by the Tribes and/or their members residing within the reservations. In addition, the Tribes seek damages against the State arising out of actions taken to enforce assessments of the challenged cigarette taxes. The Tribes also seek declaratory relief, with injunctive enforcement, from the State's exercise of civil and criminal jurisdiction over the Tribes and their members residing on the reservations (R.C.W. 37.12).

*STATE'S DEFENSE AND CAUSE :*

The State generally contests the Tribe's claims and seeks declaratory relief of lawful enforcement of its challenged taxing schemes as presently administered.

*FACTS :*

A. *Tribes :*

Each of the Tribes is a United States Government recognized sovereign Indian tribe governed by a business or tribal council under a constitution and bylaws approved by the Secretary of Interior.[2]

The Colville Indian Reservation was established by Presidential Executive Order on July 2, 1872, 1 Kapler, Indian Affairs, Laws and Treaties, 916 (2d Ed. 1904), and encompasses 1.3 million acres in the northeastern section of the state. Approximately 3,200 of the Tribe's 5,800 enrolled members live on the reservation, constituting about 46 percent of the total population.

---

1. 28 U.S.C. § 2281 was repealed by Act of August 12, 1976, Pub.L. No. 94–381, § 1, 90 Stat. 1119. However, this action is not affected thereby since it was pending on the date of enactment. *Id.* § 7.

2. Although the Lummi and Colville Tribes have a constitution approved by the Secretary of the

Interior, the respective members of the Tribes voted in 1935 not to come under the Indian Reorganization Act of 1934, 25 U.S.C. § 476, *et seq.* The Makah Tribe, on the other hand, is organized under the Indian Reorganization Act.

The Lummi Indian Reservation was established by the treaty of Point Elliot in 1855, 12 Stat. 927, and encompasses 7,319 acres primarily upon a peninsula near Bellingham, Washington. About 1,250 of the Tribe's 2,000 enrolled members live on the reservation.

The Makah Indian Reservation was established by treaty in 1855, 12 Stat. 939, and encompasses 28,000 acres at the northwestern tip of the Olympic Peninsula. Approximately 900 of the Tribe's 1,000 members live on the reservation, constituting about 63 percent of the total population of the reservation.

Each of the reservations is isolated and underdeveloped; most essential goods and services are located off the reservations.[3] Most Indian households on the reservations own at least one automobile, and the Tribes own numerous motor vehicles. While some of the tribally and individually owned vehicles are operated exclusively on the reservation, others are operated on and off the reservation. Many Indian families reside in mobile homes on the reservations, and other Indian families are obligated for the purchase or have planned the future purchase of mobile homes for on-reservation location. The Colville and Makah Tribes are plagued by unemployment rates of 33 percent and 60 percent, respectively, and all of the Tribes are desirous of economically developing their reservations to stimulate employment and generate additional tax revenues to help fund programs run by the tribal governments. These programs are designed to improve the economic well-being, health, education and social welfare of the Tribes' members.

B. *State's Enforcement of the Statutes:*

The State has for a period of nine years attempted to tax cigarettes and tobacco products sold by Indians on the Tribes' reservations. Presently the cigarette tax amounts to $1.60 per carton. The tax is imposed by requiring Dealers to sell only cigarettes to which tax stamps have been affixed. Dealers are permitted to purchase either prestamped cigarettes or a supply of stamps from the State which are affixed to the cigarettes by the Dealer prior to sale, in which case the Dealer is entitled to a specified rate of reimbursement from the State. However, WAC 458–20–192 (Rule 192) and excise tax bulletin ETB 504.08.192, November 24, 1976, restrict the taxes on cigarettes and tobacco products to sales to non-Indians by Indian tribes and Indians, as defined therein. That is, the State construes the taxes as being inapplicable to sales to Indians for their own use or for on-reservation resale to other Indians.[4]

Under R.C.W. 82.24.090, 82.32.070, Rule 192 and the excise tax bulletin, Dealers are required to keep certain specified records related to taxable and nontaxable transactions. Neither the Tribes nor their Dealers have sought authorization from the State to possess unstamped cigarette products and each has professed that it will not comply with State's cigarette and tobacco product taxing scheme.

On December 19, 1972, in an effort to enforce the cigarette taxing scheme, the State issued orders to tribal outlets on each reservation assessing unpaid taxes alleged to be due under R.C.W. 82.24, and in April, 1973, resorted to seizures of unstamped cigarettes in the stream of interstate commerce and bound for the Tribes' reservations. Furthermore, the State declared its intention to continue such seizures in the future; however, such seizures were temporarily enjoined as above delineated.

---

**3.** There is no dispute over the demarcation of the exterior boundaries of the several reservations.

**4.** Initially, the State claimed the right to tax all tribal cigarette sales regardless of whether they were made to Indians or non-Indians. This contention was asserted on the theory that the congressional grant of civil jurisdiction to the states conferred by Pub.L. No. 83–280, 67 Stat.

588 (see discussion of the State's assumption of Indian jurisdiction, *infra*) encompassed a grant of power to tax reservation Indians. However, this theory was rejected by the Supreme Court in *Bryan*. Accordingly, the State has narrowed its claims and now argues only that it may tax tribal cigarette sales to nonmembers of the Tribes.

C. *Tribal Retailers' Taxing Schemes* :

Each Tribe, during the pretrial development of the ultimate issues in these causes, enacted ordinances regulating the sale, distribution and taxation of cigarettes and tobacco products on its reservation. Each tribal ordinance was approved by the Secretary of Interior of the United States. Pursuant to the respective ordinances, the Tribes have established one or more tobacco outlets on their respective reservations.

The Dealer at each tribal tobacco outlet is a federally licensed Indian trader and a tribally licensed dealer who manages the tribally owned tobacco business outlet. Simultaneously, the Dealer at each tribal tobacco outlet, except at the Makah Resort, manages his own separate business of selling a variety of merchandise at retail. As remuneration for managing a tribal tobacco outlet, each Dealer is entitled to retain the gross revenue derived from sale of cigarettes and tobacco products in excess of the wholesale distribution price and excise tax levied by the respective Tribe.

All cigarettes and tobacco products are purchased with federally restricted tribal funds and from authorized wholesalers outside the state, which are shipped directly to the respective Tribes by sealed cargo trucks of Interstate Commerce licensed carriers. Distribution is made to the Dealers when tribal cigarette taxes fixed by the tribal or business council are collected.

The tribally levied cigarette tax ranges from forty to fifty cents per carton. Tribal ordinances read that the cigarette tax imposed by each Tribe is a tax upon distribution of cigarettes on the reservation by the respective Dealers, and the tax must be added to the retail selling price. The Tribes' cigarette taxes are an important source of revenue for the funding of the Tribes' sponsored programs for social and economic development. For example, from 1972 through 1976, during which time the Tribes refused to impose the State's cigarette taxes, the Colville Tribe earned approximately $265,760 from its cigarette tax while the Lummi and Makah Tribes earned approximately $54,440 and $13,490, respectively, from their cigarette taxes.

Due to the competitive advantage enjoyed by the Tribes over retailers who do impose the State's tax, nearly 90 percent of the Tribes' sales are made to non-Indians. The State tacitly concedes the Tribes' source of cigarette tax revenue would dry up if they were forced to add the State tax to the cost of their cigarettes. The facts dictate that the tribal taxes could not be a continuing source of income if tribal cigarette sales to non-Indians are also subject to State's cigarette tax; tribal cigarette sales to non-Indians would be eliminated and the cigarette sales commerce between the Tribes and non-Indians would be destroyed. Thus, each Tribe's ability to fund its sponsored programs would suffer substantial interference.[5]

The Tribes' ordinances exercised police power as well as taxing power. The respective ordinances provide:

(a) The tobacco products, including cigarettes, shall remain the property of the Tribe until sold to the ultimate customer;

---

5. Cigarettes are highly price elastic and even a small difference in price can have a substantial effect on purchasing habits. Although the Tribes impose a tax of about 40 to 50 cents per carton, a carton of cigarettes sells for about $1.10 to $1.20 less on the reservation than off the reservation. If, however, the tribal and State taxes were imposed, a carton of cigarettes would cost 40 to 50 cents more per carton on the reservation than off the reservation.

See the affidavit of Mr. Ronald L. Trosper, an economist who specializes in the area of American Indian economic development. He received his PhD in Economics from Harvard in 1974, is a member of the American Economic and Western Economic Associations and has served as a consultant to the American Indian Policy Review Commission and to several Indian tribes. He has also published articles in the field of Indian economic development. At the time he rendered his opinion, he was familiar with the State and tribal taxing ordinances, the economic conditions on the reservations and the factors which influence the sale of cigarettes. The State does not dispute his qualifications as an expert.

(b) A Dealer shall first obtain tribal and federal trader's licenses supported with adequate person and property liability insurance coverage on the Dealer's premises;

(c) A Dealer shall not sell tobacco products, including cigarettes, to minors, nor more than a limited number of cartons of cigarettes per non-Indian sale; and

(d) For violation penalties.

In short, each ordinance reads as a comprehensive scheme for the licensing, regulation and taxation of the sale of cigarettes on the reservations.

**D. State's Assumption of Civil and Criminal Jurisdiction :**

State's assumption of civil and criminal jurisdiction over Indians and Indian tribes has been previously discussed by the United States Court of Appeals for the Ninth Circuit. *Confederated Bands and Tribes of Yakima Indian Nation v. Washington*, 552 F.2d 1332 (9th Cir. 1977) (*Yakima 2*); *Confederated Bands and Tribes of Yakima Indian Nation v. Washington*, 550 F.2d 443 (9th Cir. 1977) (*Yakima 1*); and *Quinault Tribe of Indians v. Gallagher*, 368 F.2d 648

---

**6.** This principle was first established in *Worcester v. Georgia*, 6 Pet. 515, 31 U.S. 515, 8 L.Ed. 483 (1832). And over the years only certain limited exceptions were carved out. *E. g., New York ex rel. Ray v. Martin*, 326 U.S. 496, 66 S.Ct. 307, 90 L.Ed. 261 (1946), state court jurisdiction over crimes committed by non-Indians against each other on Indian reservations.

**7.** The scope of civil jurisdiction offered by Pub.L. No. 280 was apparently quite limited. The primary concern of Congress in enacting Pub.L. No. 280 was to combat lawlessness on Indian reservations, *Bryan*, 426 U.S. at 379, 96 S.Ct. 2102, and Congress was concerned only secondarily with extending the scope of the states' civil jurisdiction. The Supreme Court found that Pub.L. No. 280 did not confer the power to assume general civil regulatory authority. Rather, in this regard it relates only to the application of state civil law to court proceedings. *Id.*

**8.** R.C.W. 37.12.010 provides:
"The state of Washington hereby obligates and binds itself to assume criminal and civil jurisdiction over Indians and Indian territory, reser-

---

(9th Cir. 1966). We find no need here for elaboration of those discussions.

We take judicial notice that prior to 1953, the Federal Government exercised exclusive jurisdiction over Indian tribes and their reservations.[6] In 1953, Congress enacted the Act of August 15, 1953, Pub.L. No. 83–280, Ch. 505, 67 Stat. 588–90, which provided five named states with criminal and civil jurisdiction over Indians and Indian reservations and provided that certain other "option" states (including the State), with constitutional or statutory disclaimers of Indian jurisdiction, could assume such jurisdiction by amending their constitutions or statutes where necessary to do so.

The State's legislature has asserted civil and criminal jurisdiction over Indians and Indian reservations pursuant to the authority of Laws of 1957, Ch. 240, as amended by Laws of 1963, Ch. 36, codified as R.C.W. 37.12. In the absence of a tribe's consent, the State assumed jurisdiction over Indians on nontrust land and non-Indians on trust and nontrust land to the fullest extent permissible under Pub.L. No. 280.[7] With respect to trust land, the State assumed jurisdiction over Indians only as to eight subject matter areas.[8] As to consenting tribes, the

---

vations, country, and lands within this state in accordance with the consent of the United States given by the act of August 15, 1953 (Public Law 280, 83rd Congress, 1st Session), but such assumption of jurisdiction shall not apply to Indians when on their tribal lands or allotted lands within an established Indian reservation and held in trust by the United States or subject to a restriction against alienation imposed by the United States, unless the provisions of R.C.W. 37.12.021 [tribal consent] have been invoked, except for the following:

(1) Compulsory school attendance;
(2) Public assistance;
(3) Domestic relations;
(4) Mental illness;
(5) Juvenile delinquency;
(6) Adoption proceedings;
(7) Dependent children; and
(8) Operation of motor vehicles upon the public streets, alleys, roads and highways: *Provided further*, That Indian tribes that petitioned for, were granted and became subject to state jurisdiction pursuant to this chapter on or before March 13, 1963 shall remain subject to state civil and criminal jurisdiction as if chapter 36, Laws of 1963 had not been enacted."

State obligated itself to assume jurisdiction "to the same extent that this state exercises civil and criminal jurisdiction or both elsewhere within the state." R.C.W. 37.12.021. The Colville Tribe has so consented, while the Makah and Lummi Tribes have not. Accordingly, the State asserts "total" jurisdiction over the Colville Tribe, but only "partial" jurisdiction over the Makah and Lummi Tribes.

## DISCUSSION AND CONCLUSIONS:

A. *Jurisdictional Issues*:

 (1) *State's Assumption of Indian Reservation Jurisdiction*:

At the outset, we are faced with the State's contention that this Court, as a statutory three-judge District Court, has no jurisdiction over the Tribes' claim that the State's assumption of Indian reservation jurisdiction, pursuant to R.C.W. 37.12, was, *inter alia*, violative of the Equal Protection Clause of the Fourteenth Amendment.

■■■ Prior to the enactment of Pub.L. No. 94–381, 28 U.S.C. § 2281 required the designation of a statutory three-judge District Court whenever an action based upon a substantial United States constitutional question sought to enjoin the enforcement of a state statute of state-wide application. A claim is constitutionally insubstantial only if it is "essentially fictitious," "obviously frivolous," "wholly insubstantial" or "obviously without merit"; that is, "if its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy." *Goosby v. Osser*, 409 U.S. 512, 518, 93 S.Ct. 854, 859, 35 L.Ed.2d 36 (1973). The decision in *Yakima 2* forecloses the State's contention that the Tribes' Fourteenth Amendment claim is insubstantial.

*Idlewild Bon Voyage Liquor Corp. v. Epstein*, 370 U.S. 713, 715, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962), teaches that in order for such jurisdiction to be appropriate, there must be some basis for injunctive relief. Failure to name any individual official with enforcement responsibility has in the past influenced the United States Court of Appeals for the Ninth Circuit in upholding a District Court's refusal to convene a three-judge court. *Sellers v. Regents of University of California*, 432 F.2d 493, 497–98 (9th Cir. 1970), *cert. denied*, 401 U.S. 981, 91 S.Ct. 1194, 28 L.Ed.2d 333 (1971). The State argues the Tribes have failed to name "as defendants any state officers with significant responsibility for enforcing the full range of state civil and criminal laws on plaintiff's reservations" and that as a consequence this Court "probably" lacks jurisdiction over the appropriate officials which would render any injunction issued "largely illusory." We take this to be a claim that three-judge District Court jurisdiction is lacking because there is no basis for injunctive relief.

■ The only state officers named as defendants in this action are the State Treasurer, the Director of the State Department of Revenue, and the Director of the State Department of Motor Vehicles. These defendants were named because they have enforcement responsibility over the challenged taxation statutes. It is now clear that the validity of State's assumption of Indian reservation jurisdiction has no relationship to the validity or invalidity of its cigarette and tobacco products taxing schemes as applied to sales by Dealers. *Cf. Bryan.*

Fed.R.Civ.P. 65(d) provides that an order granting an injunction binds, among others, "the parties to the action, their officers, agents, servants, employees, and attorneys." The State has been made a party to this action and, except for the immunity guaranteed it by the Eleventh Amendment to the United States Constitution, any injunctive enforcement issued by this Court would bind State's officers who have the requisite enforcement responsibility.

■■■ The State has statutorily waived its Eleventh Amendment immunity to suit in its own courts, R.C.W. 4.92.100. However, such a waiver does not extend to federal court actions. *Ford Motor Co. v.*

*Dept. of Treasury of Indiana,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). Furthermore, the State has not authorized its court counsel to waive the immunity. *Skokomish Indian Tribe v. France,* 269 F.2d 555 (9th Cir. 1959). *See also Ford Motor Co.* Nevertheless Congress, in the exercise of its enumerated powers, may strip a state of its Eleventh Amendment immunity. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Parden v. Terminal R. Co.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Given the rationale used by the Court in *Moe,* 425 U.S. at 472–75, 96 S.Ct. 1634 in construing 28 U.S.C. § 1362, we must conclude that Congress has removed the states' Eleventh Amendment immunity when a suit is brought by an Indian tribe. *Aquilar v. Kleppe,* 424 F.Supp. 433, 436 (D.Alaska 1976). We conclude the State is a proper party defendant in this Court and any injunctive enforcement issued against it would run against its officers charged with the requisite enforcement responsibility.

(2) *Tax Claims* :

The parties agree that this Court has jurisdiction over the Tribes' attack on State's cigarette and tobacco products taxing schemes; however, a footnote in *Moe* necessitates a comment. The Tribes' only "constitutional" attack on the validity of the State taxing measures themselves is that those measures are violative of the Indian commerce provision of the Commerce Clause. U.S.Const. art. I, § 8, cl. 3.[9] Note 17 in *Moe* states that after *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), and *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), attacks on the validity of state statutes imposing taxes upon reservation Indians raise only Supremacy Clause issues which do not fall within the scope of 28 U.S.C. § 2281.[10] Nevertheless, in *Moe* a three-judge court had properly been convened because the case had been filed prior to the decisions in *Mescalero* and *McClanahan.* Similar treatment here is precluded because this action was commenced approximately seven weeks after those decisions.

■ Notwithstanding the language in *Moe,* we conclude this Court has jurisdiction over the Tribes' challenge of the State's statutes providing for the enforcement of its taxing measures through the declaration and seizure as contraband of unstamped cigarettes moving in interstate commerce. That claim raises a substantial federal question under the Commerce Clause.[11]

■ The State's assertion that it may seize such shipments depends on the validity of the imposition of taxes in the first

9. Although the Tribes mount several other attacks on State's taxing scheme which are discussed *infra,* these attacks depend in the final analysis upon invocation of the Supremacy Clause and, therefore, do not require the convocation of a three-judge court. *Swift & Co. v. Wickham,* 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965).

10. "It is thus clear that the basis for the invalidity of these taxing measures [imposing taxes on reservation Indians], which we have found to be inconsistent with existing federal statutes, is the Supremacy Clause, U.S.Const., Art. VI, cl. 2, and not any automatic exemptions 'as a matter of constitutional law' either under the Commerce Clause or the intergovernmental-immunity doctrine as laid down originally in *M'Culloch v. Maryland,* 4 Wheat. 316, 4 L.Ed. 579 (1819). If so, then the basis for convening a three-judge court in this type of case has effectively disappeared, for this Court has expressly held that attacks on state statutes raising only Supremacy Clause invalidity do not fall within the scope of 28 U.S.C. § 2281. *Swift & Co. v. Wickham,* 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). Here, however, the District Court properly convened a § 2281 court, because at the outset the Tribes' attack asserted unconstitutionality of these statutes under the Commerce Clause, a not-insubstantial claim since *Mescalero* and *McClanahan* had not yet been decided. *See Goosby v. Osser,* 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973)." *Moe,* 425 U.S. at 481 n.17, 96 S.Ct. at 1645.

11. The Tribes attack these statutes only insofar as the State seeks to apply them to the Tribes. Nevertheless the Supreme Court has held that a three-judge court is required whether statute was attacked on its face or as applied. *Dept. of Employment v. United States,* 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966); *Steffel v. Thompson,* 415 U.S. 452, 457 n.7, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

instance. Thus, a valid challenge to the validity of the taxes could vitiate the need to review the constitutionality of the enforcement provisions. It is clear that a three-judge District Court properly convened has the power to dispose of a case on any ground presented to it. *Florida Lime & Avocado Growers v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *United States v. Georgia Pub. Serv. Comm'n,* 371 U.S. 285, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963). Not only does the Court have jurisdiction to adjudicate such issues but to do so furthers the well established principle of deciding constitutional issues only if necessary. *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); and *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936). Finally, since this Court has expended substantial judicial time with the issues, it is in the interest of "judicial economy, convenience and fairness to [the] litigants" (*United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)) to retain jurisdiction over these claims.

### (3) *State's Claims for Relief* :

The State seeks a declaratory judgment that its statutes and regulations pertaining to the taxation of retail on-reservation sales of cigarettes, tobacco products and other reservation produced products are valid. Such claim is largely superfluous since, with the exception of the retail sales tax question, the substantive issues raised by these claims must be met by the Court in passing upon the claims of the Tribes. The Tribes have not, however, challenged the validity of the State's general retail sales tax, R.C.W. 82.08. It has been long recognized that absent congressional authorization or possibly their own consent, Indian tribes enjoy immunity from suit in federal, state or tribal courts. *Puyallup Tribe v. Washington Game Dept.,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977); *Turner v. United States,* 248 U.S. 354, 39 S.Ct. 109, 63 L.Ed. 291 (1919); *Hamilton v. Nakai,* 453 F.2d 152, 158–59 (9th Cir. 1972). This immunity extends to freedom from suit on cross claims. *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940). Since the Tribes have not consented to suit, this Court has no jurisdiction to entertain the State's claims for declaratory relief.[12]

The fact that State might by way of recoupment reduce its liability does not grant it a right of action for affirmative relief. *Bull v. United States,* 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935).

### B. *Subject Matter Issues* :

#### (1) *Cigarette Tax Issues* :

A decision in this case has been delayed because at one time the parties thought the Supreme Court's forthcoming decisions in *Bryan* and *Moe* would be dispositive of the issues presented here. *Bryan,* in eliminating the State's claim that the grant of civil jurisdiction in Pub.L. No. 280 was a congressional grant of authority to the states to impose taxes upon reservation Indians, did help to narrow the issues presented here. However, *Moe* has generated more confusion or disagreement between the parties than it eliminated. The State maintains that *Moe* resolved most of the remaining issues in its favor while the Tribes argue that *Moe* is distinguishable in some respects and that the Supreme Court reserved decision in others.

---

12. The State urges that a provision in the corporate charter of the Makah Tribe constitutes a consent to suit. Since such consent would amount to a waiver of what amounts to sovereign immunity, its terms "must be strictly observed and exceptions thereto are not to be implied." *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957). *Cf. United States v. Sherwood,* 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). Consent by a tribe to suit in its corporate capacity does not constitute consent to suit against the tribe in its governmental capacity. *Namekagon Dev. Co. v. Bois Forte Res. Hous. Auth.,* 395 F.Supp. 23 (D.Minn.1974), *aff'd,* 517 F.2d 508 (8th Cir. 1975).

In *Moe,* the Confederated Salish & Kootenai Tribes and some of their members brought two actions seeking declaratory and injunctive relief against Montana's cigarette and personal property taxes and vendor licensing statutes as applied to tribal members living on the reservation. The Supreme Court affirmed the rulings of the three-judge District Court, holding that "the personal property tax on personal property located within the reservation; the vendor license fee sought to be applied to a reservation Indian conducting a cigarette business for the Tribe on reservation land; and the cigarette sales tax, as applied to on-reservation sales by Indians to Indians, conflict with the congressional statutes which provide the basis for decision with respect to such impositions. *McClanahan, supra; Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973)." *Id.* 425 U.S. at 480–81, 96 S.Ct. at 1644. The Court also upheld the District Court's ruling that Montana's cigarette sales tax was valid as applied to on-reservation sales by Indians to non-Indians and that Montana could with respect to such sales "require the Indian proprietor simply to add the tax to the sales price and thereby aid the State's collection and enforcement" (*id.* at 483, 96 S.Ct. at 1646) of the tax without placing an unconstitutional burden on tribal self-government or conflicting with any congressional statute. Since the Court found that the Montana cigarette tax was levied upon the non-Indian consumer rather than the tribe or the Indian retailer, the holding did not conflict with the general rule that absent congressional consent, taxation of "Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation" is impermissible. *Mescalero,* 411 U.S. at 148, 93 S.Ct. at 1270.

In its attempt to distinguish *Moe,* we are met at the outset with the Tribes' contention that unlike in *Moe,* the tax here must fail because the legal incidence of the tax is imposed directly upon the Tribe or Indian retailer rather than the non-Indian consumer. The State concedes that if the statute is so construed, the tax must fail. The State, however, pointing to the language of its retail sales tax enactment, a recent amendment to its cigarette tax Act, and judicial and administrative construction thereof, argues that at least with respect to sales by Indian retailers, the legal incidence of the tax falls upon the non-Indian consumer.

 In situations wherein federal immunity is affected by a determination as to which party to a transaction bears the legal incidence of a state tax, the federal courts "are not bound by the state court's characterization of the tax." *First Agricultural Bank v. Tax Comm'n,* 392 U.S. 339, 347, 88 S.Ct. 2173, 2177, 20 L.Ed.2d 1138 (1968). For purposes of deciding federal constitutional questions, "where a State requires that its sales tax be passed on to the purchaser and be collected by the vendor from him, this establishes as a matter of law that the legal incidence of the tax falls upon the purchaser." *United States v. Mississippi Tax Comm'n,* 421 U.S. 599, 608, 95 S.Ct. 1872, 1878, 44 L.Ed.2d 404 (1975). *See also First Agricultural Bank; Kern-Limerick v. Scurlock,* 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954); *Alabama v. King & Boozer,* 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941). This is true notwithstanding the fact that the seller is legally liable for payment of the tax. *Mississippi Tax Comm'n,* 421 U.S. at 607, 95 S.Ct. 1872.

The State in arguing that the legal incidence of the cigarette tax falls upon the non-Indian buyer, rather than tribal sellers, relies by analogy on the provisions of State's general sales tax. R.C.W. 82.08. Such reliance is misplaced. The sales tax statute specifically provides that the sales tax shall be paid by the buyer to the seller, that each seller shall collect the tax from the buyer, and that the amount of the tax "shall constitute a debt from the buyer to the seller." In addition, it provides that the tax shall be stated separately from the selling price and not be included in the sales price of an item. R.C.W. 82.08.050. Under the standards announced by the Supreme Court, such terms would appear to require a finding that the legal incidence of the tax,

as a matter of law, falls upon the purchaser. The cigarette tax by contrast does not have similar provisions. Of particular importance is the absence of any provision requiring that the tax be passed on to the buyer. Thus, the decisions of the Supreme Court do not necessarily require a conclusion that the legal incidence of State's cigarette tax is on the buyer.

■ Although the statutory language does not irresolutely lead to a conclusion that the legal incidence of the tax falls upon the purchaser, it also does not necessarily require the contrary conclusion that it falls upon the seller. In the final analysis, the key to making the determination is the divination of legislative intent. *First Agricultural Bank,* 392 U.S. at 348, 88 S.Ct. 2173. If recourse to the statutory language alone is inadequate, this Court may certainly seek guidance from the interpretations of the enactment by State's judiciary and its executive officers.

In determining the legislature's intent, the obvious starting point must be the language of the applicable statute. The basic structure and intended scope of the statute is set out in R.C.W. 82.24.020 and 82.24.080. The former section imposes the tax and provides in part:

> "There is levied and there shall be collected as hereinafter provided, a tax upon the sale, use, consumption, handling, possession or distribution of all cigarettes, in an amount equal to the rate of six and one-half mills per cigarette."

Prior to 1972, § 82.24.080 provided in part:

> "It is the intent and purpose of this chapter to levy a tax on all of the articles taxed herein, sold, used, consumed, handled, or distributed within this state and to collect the tax from the person who first sells, uses, consumes, handles, or distributes them in the state."

In 1972, this section was amended to read as follows:

> "It is the intent and purpose of this chapter to levy a tax on all of the articles taxed herein, sold, used, consumed, handled, possessed, or distributed within the state and to collect the tax from the person who first sells, uses, consumes, handles, possesses (either physically or constructively in accordance with RCW 82.24.020) or distributes them in this state. . . .
>
> "It is also the intent and purpose of this chapter that the tax shall be imposed at the time and place of the first taxable event occurring within this state."

Referring to the statutory language, the Tribes point out that tribal retailers possess, handle, and distribute the cigarettes within the state of Washington prior to their sale to the non-Indian buyers. Then pointing to the additional language that the tax is to be imposed upon the occurrence of the first taxable event within the state, they contend that particularly in the absence of a pass-on provision, it is inescapable that the legal incidence of the tax is imposed on tribal retailers. The Tribes claim the legislature's intent to impose the legal incidence of the tax upon the seller is further supported by the decisions of the Washington Supreme Court in *Makah Indian Tribe v. Tax Comm'n,* 72 Wash.2d 613, 434 P.2d 580 (1967), and *Canteen Service, Inc. v. Washington,* 83 Wash.2d 761, 522 P.2d 847 (1974). In *Makah,* the Court upheld the imposition of the cigarette excise tax upon sales by Washington wholesalers to the Mukah Tribe on the theory that the legal incidence of the tax fell on the wholesaler rather than the Tribe as purchaser. In *Canteen Service,* the Washington Supreme Court, holding that the retail selling price for purposes of determining the amount of the general sales tax to be applied to the sale of cigarettes included the excise tax paid on the cigarettes, stated:

> "The legal incidence of the cigarette stamp tax is upon 'the person who first sells, uses, consumes, handles, . . . or distributes them in the state.' RCW 82.24.080. *Thus, the legal incidence of the tax will fall upon the one who first brings the cigarettes into the state and does any of the mentioned acts.*" 522 P.2d at 848. (Emphasis added).

The State candidly admits that in *Canteen Service,* the Washington Supreme

Court held that the legal incidence of the cigarette tax fell upon the retailer but nevertheless maintains that *Canteen Service* is not dispositive of this case.

Focusing on the statutory language which imposes the tax upon the occurrence of the first taxable event, the State reads the statute as imposing the legal incidence of the tax upon the seller where the transaction takes place within the state and involves only non-Indians, but upon the buyer where the transaction involves an on-reservation sale by an Indian to a non-Indian. The State reaches this conclusion by construing the first taxable event language as doing more than merely referring to the first in the series of events enumerated in R.C.W. 82.24.020 and .080. The State argues that properly construed, the statutory language means that an enumerated event is not the first taxable event unless it is constitutionally taxable. Assuming that to be the case, since an Indian retailer is exempt from the imposition of the tax under the Supremacy Clause, it follows that the first taxable event would be the use or consumption by the non-Indian buyer. Conversely, where the transaction involves a seller who is not immune from state taxation, as in *Canteen Service,* the first taxable event would be his possession, handling or distribution of the cigarettes and the legal incidence of the tax would be upon him rather than the purchaser.

The State Department of Revenue has officially adopted the interpretation of R.C.W. 82.24.080 urged on this Court and has published its conclusion in E.T.B. 504.-08.192.[13]

The Tribes urge this Court to give no weight to the excise tax bulletin on the theory that it is "a clear subterfuge" and "an attempt to rewrite RCW 82.24.080 in order to make it valid . . . ." While we recognize that the State's agencies have no power to amend State legislation by administrative rules or bulletins, it is proper to give weight to such pronouncements in determining the meaning of its statutes. *Pierce County v. State,* 66 Wash.2d 728, 404 P.2d 1002 (1965); *Pringle v. State,* 77 Wash.2d 569, 464 P.2d 425 (1970).

This interpretation also draws support from several other sources including a recent amendment to the cigarette tax statute. In September, 1970, in response to an inquiry from a member of the state legislature, the Attorney General of the state of Washington issued an opinion, AGO 1970 No. 20, which recognized that the legal incidence of the tax could shift depending on the circumstances surrounding the sale. In part, this opinion stated that in situations wherein State lacked jurisdiction to impose its cigarette tax upon Indian retailers, "if the purchaser from such retailer is a non-Indian . . . the duty to buy the cigarette excise tax stamps, and thereby to pay the tax, devolves on this purchaser . . . ." *Id.* at 13 n.5.[14] Of more significance is the language in *Tonasket v. State,* 84 Wash.2d 164, 525 P.2d 744 (1974), which decision was

---

**13.** E.T.B. 504.08.192 provides in part:

"Under the holding of our Court in *Canteen Service, Inc. v. State,* (83 Wn.2d 761 [522 P.2d 847]) and *Tonasket v. State* (84 Wn.2d 761 [164] [525 P.2d 744]) the cigarette tax and tobacco products tax apply upon the 'first taxable event' in this state. This makes a different measure for the sales tax in the case of sales by Indians to non-Indians than is the case for a taxable sale by a non-Indian.

"a. *Sale by an Indian to a Non-Indian:* Here the first taxable event is the possession by the non-Indian and therefore the cigarette or tobacco products tax due on the sale is *not* a part of the selling price on which the sales tax is due.

"b. *Sale by a Non-Indian:* Here the taxable incidence falls on the first handler, distribu-

tor, or seller and thus the first taxable event occurs when the products are first handled, distributed, or sold within this state. Since this occurs prior to the retail sale, the cigarette or tobacco products tax is part of the selling price, even in the case of sales, which are sales tax exempt under paragraph 2, above. *Canteen Service, supra.*"

**14.** A major premise of the opinion was that Pub.L. No. 280 was a congressional grant of power to the states to assume civil jurisdiction over the reservation Indians including the power of taxation. The fact that this theory was later repudiated by the Supreme Court in *Bryan* does not detract from the opinion's comment on the legal incidence issue.

issued by the Washington Supreme Court shortly after its decision in *Canteen Service.* In *Tonasket,* the Washington Supreme Court affirmed the imposition of the State's cigarette tax upon sales by reservation Indians to non-Indians. After noting that imposition of the tax upon sales involving only reservation Indians would likely be barred by *Warren Trading Post Co. v. Arizona Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), the Court stated:

> "The tax here sought to be imposed upon Mr. Tonasket's cigarette sales to non-Indians is, among other things, one levied upon the 'use' and 'consumption' of the cigarettes. By Laws of 1972, 1st Ex. Sess., ch. 157, § 4, the legislature amended RCW 82.24.080, by proclaiming it to be also the intent of the chapter that the cigarette tax be imposed at the time and place of the first taxable event. If this legislative declaration be an expression of what the legislature always intended with respect to RCW 82.24.080, then, since Mr. Tonasket was purchasing cigarettes from an Oregon distributor for resale to reservation Indians as well as to non-Indians, *it would appear logical to conclude that the first taxable event would be the resale of the cigarettes to a non-Indian,* at which time Mr. Tonasket could be required to affix the tax stamp and collect the amount of the tax from a non-Indian customer." 525 P.2d at 754. (Emphasis added).

Although the language is somewhat unclear since the Court denominated the taxable event as the resale of the cigarettes, given the focus of the Court on the statute's alternative applicability to use or consumption and the commonly imposed requirement that use taxes be collected by retailers, it seems safe to conclude that the Court meant that the use or consumption was the taxable event and thus recognized that the legal incidence of the tax could shift depending on the circumstances of the transaction.

Finally, the legislature itself gave a strong indication that it interpreted the legal incidence of the tax as falling upon the non-Indian purchaser in transactions involving on-reservation sales to non-Indians in a 1975 amendment to the cigarette tax Act. As amended in 1975, R.C.W. 82.24.260 provides in part:

> "Any retailer who sells or otherwise disposes of any unstamped cigarettes other than . . . a federally recognized Indian tribal organization with respect to sales to enrolled members of the tribe *shall collect from the buyer or transferee thereof the tax imposed on such buyer or transferee by RCW 82.24.020* . . . and remit the same to the department . . . ." (Emphasis added).

In sum, this Court concludes the statute evidences the legislature's intent to impose the legal incidence of the tax at the earliest constitutional opportunity. Where on-reservation tribal sales to non-Indians are involved, the first taxable event is, therefore, the use or consumption by the non-Indian purchaser. In such situations, the legal incidence falls upon the non-Indian purchaser rather than the tribal seller.[15]

---

**15.** A similar conclusion cannot be reached with respect to State's tobacco products tax. R.C.W. 82.26. Although the parties have discussed the cigarette and tobacco products taxes as if they stand or fall together, the statutory language of the latter makes it clear that the legal incidence of the tax falls upon the Dealer. Actually State imposes two taxes upon specified tobacco products other than cigarettes. "A floor stocks tax is . . . imposed upon every distributor of tobacco products" by R.C.W. 82.26.020(2). The Dealers are clearly distributors within the terms of the statute since distributor is defined to include "any person engaged in the business of selling tobacco products in this state who brings, or causes to be brought, into this state from without the state any tobacco products for sale." R.C.W. 82.26.010(3). The second tax is "upon the sale, use, consumption, handling, or distribution of all tobacco products" in Washington. R.C.W. 82.26.020(1). Unlike the cigarette tax, there is no statutory language imposing the tax upon the first taxable event. Rather the tax is imposed when "the distributor (a) brings, or causes to be brought, into this state from without the state tobacco products for sale." R.C.W. 82.26.020(1). Thus, in both instances the legal incidence falls upon the Dealer and the tax is invalid.

Having concluded that insofar as on-reservation sales to non-Indians are concerned, the State imposes a tax upon the use or consumption of cigarettes by non-Indians, the legal incidence of which falls upon them, we turn to a consideration of the Tribes' other contentions.

The first alternative claim raised against the validity of the tax by the Tribes is that it is violative of the Indian Commerce Clause because it imposes a multiple tax burden on Indian commerce which is not shared by non-Indian commerce.[16] In order to establish this proposition, the Tribes rely by analogy on decisions of the Supreme Court construing the scope and effect of the Commerce Clause as it has been applied to interstate as opposed to Indian commerce. The Tribes argue that the rationale of such cases is applicable since "[i]t is no more permissible for a state to discriminate against Indian commerce than it is to discriminate against interstate commerce."

A full review of these contentions is, however, unnecessary. The simple answer is that such claims have been prohibited by the Supreme Court. The cases on which the Tribes rely for support have established a doctrine of "constitutional law" based upon a construction of the scope and effect of the Commerce Clause in the absence of controlling federal statutes. *E. g., Freeman v. Hewit,* 329 U.S. 249, 252, 67 S.Ct.

274, 91 L.Ed. 265 (1946); *Southern Pac. Co. v. Arizona,* 325 U.S. 761, 769–70, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945); *Gwin, White & Prince v. Henneford,* 305 U.S. 434, 438, 59 S.Ct. 325, 83 L.Ed. 272 (1939). *See Nelson v. Sears, Roebuck & Co.,* 312 U.S. 359, 61 S.Ct. 586, 85 L.Ed. 888 (1941); *Henneford v. Silas Mason Co.,* 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937); *Monamotor Oil Co. v. Johnson,* 292 U.S. 86, 54 S.Ct. 575, 78 L.Ed. 1141 (1934).

In *Moe,* 425 U.S. at 481 n. 17, 96 S.Ct. at 1645, the Court made it clear that after *Mescalero* and *McClanahan,* state tax statutes which affect Indian tribes and Indians will not be invalidated as a result of "any automatic exemptions 'as a matter of constitutional law' either under the Commerce Clause or the intergovernmental-immunity doctrine . . . ." It is true nevertheless that the Court has established the general rule that a state may not tax Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation absent congressional consent, *Mescalero* and *McClanahan.*[17] Outside the "special area of state taxation"[18] the Tribes have the burden of establishing that a challenged state regulation "frustrates tribal self-government, *see Williams v. Lee,* 358 U.S. 217, 219–220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), or runs afoul of any congressional enactment dealing with

---

**16.** This Court is mindful of the Ninth Circuit's recent decision in *Fort Mojave Tribe v. San Bernardino County,* 543 F.2d 1253 (9th Cir. 1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977). In *Fort Mojave,* both the county government and the tribe imposed a tax on the non-Indian lessee of Indian property on the reservation. Nevertheless, without citation of authority, the Court held that there was no impermissible double taxation because the taxes were "imposed by two different and distinct taxing authorities." *Id.* at 1258. This, of course, does not resolve the issue but merely restates the question. In every case in which the Supreme Court has struck down state taxes as being violative of the Commerce Clause due to double taxation, more than one taxing authority has been actually or potentially involved. However, in view of our disposition of this issue, there is no need to consider whether this Court, as a three-judge District Court, is bound by the law of the Circuit in which it sits. *Compare Jehovah's Witnesses v. King County*

*Hosp.,* 278 F.Supp. 488, 504–05 (W.D.Wash. 1967), *aff'd,* 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968), with *Athanson v. Grasso,* 411 F.Supp. 1153, 1157 (D.Conn.1976), and *Alabama NAACP State Conference of Branches v. Wallace,* 269 F.Supp. 346, 350 (M.D.Ala.1967).

**17.** Even this general rule was established as the result of the conclusion that state taxation was preempted after considering the relevant federal treaties and statutes rather than as an automatic rule of constitutional law based upon the construction of a particular section of the Constitution.

**18.** Since the legal incidence of the tax involved here falls upon the non-Indian purchaser of cigarettes rather than the Tribes, this case falls outside the special area of state taxation to which the aforementioned general rule is applicable. *Moe,* 425 U.S. at 483, 96 S.Ct. 1634.

the affairs of reservation Indians, *United States v. McGowan,* 302 U.S. 535, 539, 58 S.Ct. 286, 82 L.Ed. 410 (1938) . . . ." *Moe,* 425 U.S. at 483, 96 S.Ct. at 1646.

The State implements its cigarette tax by imposing the burden of collecting it upon the Dealers. The Tribes, continuing their reliance on the analogy to cases interpreting the Interstate Commerce Clause, urge that the imposition of the collection requirement upon the Dealers is violative of the Due Process Clause.[19]

The short answer to these contentions is that the Supreme Court expressly approved such a collection requirement in *Moe.*

"We therefore agree with the District Court that to the extent that the 'smoke shops' sell to those upon whom the State has validly imposed a sales or excise tax with respect to the article sold, the State may require the Indian proprietor simply to add the tax to the sales price and thereby aid the State's collection and enforcement thereof." 425 U.S. at 483, 96 S.Ct. at 1646.

We are unpersuaded by the Tribes' effort to distinguish *Moe* in this regard by claiming that unlike in *Moe,* there is here an absence of the required nexus between Dealer, upon whom the collection requirement is imposed, and the taxing jurisdiction. They suggest that the nexus in *Moe* was supplied by the Indian retailer's purchase of his cigarette inventory from a Montana wholesaler. In contrast, they point out that here the Dealers neither purchase their inventories from an in-state wholesaler nor do they maintain any offices or send any agent off the reservation to solicit sales. Consequently, they argue there is no nexus with the State sufficient to support a collection requirement.

■ In interstate commerce cases, it has long been recognized that "[s]tates necessarily impose the burden of collecting the [use] tax on the out-of-state seller; the impracticability of its collection from the multitude of individual purchasers is obvi-ous. . . . However, not every out-of-state seller may constitutionally be made liable for payment of the use tax on merchandise sold to purchasers in the State." *National Georgraphic Society v. California Board of Equalization,* 430 U.S. 551, 555, 97 S.Ct. 1386, 1390, 51 L.Ed.2d 631 (1977). Principles of due process require that in order for a collection requirement to be valid, the out-of-state seller must have some nexus to the taxing state; the "simple but controlling question is whether the state has given anything for which it can ask return." *Wisconsin v. J. C. Penney Co.,* 311 U.S. 435, 444, 61 S.Ct. 246, 250, 85 L.Ed. 267 (1940).

This test is satisfied if the person on whom the collection duty is imposed has "some definite link" or "minimum connection" with the taxing jurisdiction. *National Bellas Hess, Inc. v. Dept. of Revenue,* 386 U.S. 753, 756, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967); *Miller Bros. Co. v. Maryland,* 347 U.S. 340, 344–45, 74 S.Ct. 535, 98 L.Ed. 744 (1954). This link is sufficient if the seller receives any services from the taxing state, and it is irrelevant that the services received are unrelated to the activity of the seller which gave rise to the collection duty. *National Geographic,* 430 U.S. at 560–61, 97 S.Ct. 1386.

■ Thus, it is apparent that the Tribes read *Moe* much too narrowly. In *Moe,* the Court neither mentioned the nexus requirement nor did it give any special significance to the fact that the Indian retailer secured his inventory from an in-state wholesaler. This was undoubtedly because of the substantial presence of the Indian retailer in the state. After all, the reservation exists within the territorial boundaries of State. Indians are citizens of the State and are entitled to and do receive services from it. Although this is not sufficient to justify direct state taxation of Indians or Indian tribes in the face of conflicting treaties and/or federal statutes, it clearly consti-

---

19. In asserting this claim, the Tribes neither attack the validity of the tax nor do they rely directly on the unadorned force of the Com-

merce Clause itself. Accordingly consideration of this claim is not prohibited by the language in note 17 of *Moe.*

tutes a sufficient link so that the mere imposition of a collection requirement does not violate due process.

The Tribes next argue that the State's cigarette tax has been preempted by the Indian Traders Act, 25 U.S.C. § 261, et seq.; by federal policy underlying the Indian Reorganization Act of 1934, 25 U.S.C. § 476, et seq., Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. § 450, et seq., and the Indian Financing Act of 1974, 25 U.S.C. § 1451, et seq.; and, finally, by tribal ordinances establishing a comprehensive regulatory and taxing scheme for transactions involving on-reservation sales by Indian retailers to Indians and non-Indians.

■■■ It is well established that when Congress passes legislation in implementation of one of its enumerated powers, it may be so pervasive as to preclude any state regulation in the same field. *Warren; Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). This may be true even though the state regulation is consistent with and merely seems to supplement a less pervasive federal regulatory scheme. *Campbell v. Hussey,* 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). One test which has been frequently cited by the Court was first promulgated in *Hines,* 312 U.S. at 67, 61 S.Ct. at 404:

> "This Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. . . . In the final analysis, there can be no one crystal clear distinctly marked formula. Our primary function is to determine whether [a challenged statute] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

The preemptive scope of Indian Traders Act was first considered by the Supreme Court in *Warren* wherein an Arizona statute which imposed a tax upon the income of a federally licensed Indian trader derived from the on-reservation sale of goods to Indians was struck down. Noting the long history of comprehensive federal regulation of Indian traders, the Court found

> "the evident congressional purpose of ensuring that no burden shall be imposed upon Indian traders for trading with Indians on reservations except as authorized by Act of Congress or by valid regulations promulgated under those Acts." 380 U.S. at 691, 85 S.Ct. at 1246.

Consistent with the principles of federal preemption, the Court struck down the tax. To do otherwise, would have

> "put financial burdens on [the trader] or the Indians with whom it deals in addition to those Congress or the tribes have prescribed, and could thereby disturb and disarrange the statutory plan Congress set up in order to protect Indians against prices deemed unfair or unreasonable by the Indian Commissioner." *Id.*

More recently the Court had occasion to mark the limit of the preemptive scope of the Indian Traders Act. The congressional objective of insulating Indian traders from state regulation in their dealings with Indians was emphasized in *Moe* as the Court, distinguishing *Warren,* rejected an argument similar to that made by the Tribes here. The fact that Montana placed its cigarette tax on the non-Indian consumer rather than the Indian trader as in *Warren* was held to impose no burden on the trader sufficient to trigger preemption by the Indian Traders Act.

*Moe,* however, does not dispose of the Tribes' further argument that *Warren* requires the conclusion that the reporting aspects of State's collection requirement have been preempted. In *Moe,* although the Court approved the requirement that the Indian trader add the tax to the sales price, it expressly reserved judgment on whether the state could lawfully impose additional burdens on the trader. 425 U.S. at 468 n. 6, 96 S.Ct. 1634.

To the extent a limited collection burden was approved by the Court in *Moe,* it related to the trader's transactions with non-Indians rather than Indians. Thus, the Court's holding in *Warren* that the Indian Traders Act left no room for state regulations burdening Indian traders as a result of their on-reservation transactions with Indians was left intact.

In this case, the requirements imposed by the State, as set forth in E.T.B. 504.08.192, go beyond requiring the trader to collect the tax on sales to non-Indians. Although recognizing that sales to Indians may not be made subject to the tax, the State requires the Dealers to "demonstrate entitlement to make such sales without collection of tax" by keeping detailed records of sales to Indians. Dealers are required to record and retain for state inspection the names of all Indian purchasers, their tribal affiliations, the Indian reservations to which or within which sales are made, and the dollar amounts and dates of the sales. In addition, unless the Indian purchaser is personally known to the Dealer, he must require presentment of a tribal identification card issued by the member's tribe. This constitutes a burden on the Dealer which relates to his transactions with Indians. Further, State makes no provision for compensating him for the burden imposed. Even if his sales to non-Indians declined or were purposely discontinued, the burden would continue undiminished. In fact, the only way a Dealer could avoid the record keeping requirement would be to cease doing business with Indians as well as with non-Indians. Since State has pointed to no "Acts of Congress or valid regulations promulgated under those Acts" (*Warren,* 380 U.S. at 691, 85 S.Ct. at 1246) which authorize such, the record keeping requirements are invalid.

The Tribes next urge that even if the Court finds that the State's cigarette tax has not been preempted by the Indian Traders Act, it has been preempted by "well established federal policy . . . encouraging Indian self-government and economic development" underlying the Indian Reorganization Act, Indian Self-Determination Act, and the Indian Financing Act. We disagree.

The statutes relied upon by the Tribes do establish a general federal policy favoring Indian self-government and economic development. The Indian Reorganization Act, for example, was passed by Congress to encourage tribes to revitalize their self-government by adopting constitutions and bylaws and creating chartered corporations, with power to conduct business and economic affairs. *Mescalero,* 411 U.S. at 151, 93 S.Ct. 1267. In *Bryan,* 426 U.S. at 389 n. 14, 96 S.Ct. at 2111, the Supreme Court, citing the Indian Self-Determination Act and the Indian Financing Act, noted that federal policy was "returning to a focus upon strengthening tribal self-government." *See also Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655, 663 (9th Cir. 1975). However, the Supreme Court has never suggested that any of these statutes has of its own force established a policy of implied tax immunity for Indian tribes or those dealing with Indian tribes. In fact, in *Mescalero* the Court held that the Indian Reorganization Act did not create a tax immunity for income earned by a tribally run corporation from its off-reservation activities.

Notwithstanding the existence of such a general federal policy, a review of the cases cited by the Tribes and uncovered by our own research reveals that in order to determine whether state legislation "stands as an obstacle to the accomplishment" of some federal purpose, it must be compared to a federal enactment on the same subject. That is, the threshold test is whether the state and federal governments have attempted to regulate the same subject matter. *See, e. g., City of Burbank v. Lockheed Air Terminal,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), (regulation of airport noise levels); *Florida Lime & Avocado Growers* (maturity of avocados for marketing); *Campbell* (labeling of tobacco for marketing); *Castle v. Hayes Freight Lines,* 348 U.S. 61, 75 S.Ct. 191, 99 L.Ed. 68 (1954), (licensing of common carrier); *California v.*

*Zook,* 336 U.S. 725, 69 S.Ct. 841, 93 L.Ed. 1005 (1949), (sale or arrangement of transportation on a public highway); *Rice* (regulation of rates charged by warehouse operators); *Cloverleaf Butter Co. v. Patterson,* 315 U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754 (1942), (production standards for renovated butter); and *Hines* (registration of aliens as a distinct group).

The difficulty for the Tribes is that they can point to no provision in any of the cited Acts which attempts to implement the federal policy favoring Indian self-government and economic development by regulating subject matter closely related to that touched on by the State's cigarette tax. The necessity of such a showing to establish preemption is further buttressed by the Supreme Court's analysis in *Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976). In *Fisher,* the Court held that a Montana statute regulating adoption of Indian children on the Northern Cheyenne Indian Reservation was preempted by the passage of a tribal ordinance covering the same subject matter. While the Court expressly acknowledged the federal policy underlying the passage of the Indian Reorganization Act, it did not rely on the force of that general policy standing alone to invalidate the statute. Rather, the decision that the state statute had been preempted turned on the implementation of the underlying federal policy through the passage of the tribal adoption ordinance.

"In 1935, the [Northern Cheyenne] Tribe adopted a Constitution and By-Laws pursuant to § 16 of the Indian Reorganization Act, . . . a statute specifically designed to encourage Indian tribes to revitalize their self-government. *Mescalero Apache Tribe, supra* [411 U.S.], at 151 [93 S.Ct. 1267]. Acting pursuant to the Constitution and By-Laws, the Tribal Council . . . established the Tribal Court and granted it jurisdiction over adoptions . . . ." *Id.* at 387, 96 S.Ct. at 946.

"The tribal ordinance conferring jurisdiction on the tribal court was authorized by § 16 of the Indian Reorganization Act, 25 U.S.C. § 476. Consequently, it imple-

ments an overriding federal policy which is clearly adequate to defeat state jurisdiction over litigation involving reservation Indians. Accordingly, . . . that jurisdiction has now been pre-empted." *Id.* at 390, 96 S.Ct. at 948.

Thus, absent some legislation touching upon the subject matter regulated by the State, the federal policy underlying the Acts relied on by the Tribes does not preempt the State's cigarette taxing scheme.

We now come to the Tribes' contention that the State's scheme has been preempted by the passage of tribal cigarette ordinances.

■■■ It is clear that Congress may validly delegate legislative authority to an Indian tribe even if the exercise of that authority involves control over the conduct of non-Indians. *United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). In addition, it is clear that where an Indian tribe exercises delegated authority in the implementation of federal policy and the result is a tribal ordinance which conflicts with an otherwise valid state statute, the state statute is preempted. *Fisher.* Although *Fisher* involved a statute which affected only Indians, there is no reason to believe that preemption would be precluded merely because the state and tribal enactments also affected non-Indians on tribal lands and as much has been recognized by other federal courts. In *Confederated Tribes of Colville Indian Reservation v. Washington,* 412 F.Supp. 651 (E.D.Wash. 1976), the District Court held that a state statute requiring non-Indians to purchase state fishing licenses prior to fishing on the Colville Indian Reservation was preempted by the enactment of a tribal ordinance, pursuant to federally delegated power, which established "a comprehensive program for the administration of tribal fisheries resources" and which, in part, required non-Indians to purchase fishing licenses from the tribe. To the same effect is *Eastern Band of Cherokee Indians v. North*

*Carolina,* No. BC–C–76–65 (W.D.N.C. August 27, 1976).[20]

The questions remain then whether there has been a delegation of legislative authority to the Tribes and, if so, whether there has been a preemption.

In 1936, the Makah Tribe adopted a constitution and bylaws pursuant to the Indian Reorganization Act, and the passage of its cigarette ordinance was an exercise of governmental power authorized by § 16 of the Act, 25 U.S.C. § 476. This clearly constitutes the exercise of congressionally delegated power. *Fisher.*

The Colville and Lummi Tribes, however, voted in 1935 not to come under the Indian Reorganization Act. Nevertheless we conclude they were exercising congressionally delegated power in passing their cigarette ordinances. Their constitution and bylaws were ratified by a majority of the members, approved by the Secretary of Interior and any amendment is subject to the provisions of 25 C.F.R. 53.1—the same conditions which are imposed on tribes organizing under the Indian Reorganization Act. Federal programs designed to encourage tribal self-government and economic development are uniformly made available to all federally recognized tribes not just those which are organized under the Indian Reorganization Act. See, e. g., § 3 of the Indian Financing Act, 25 U.S.C. § 1452, and § 4 of the Indian Self-Determination Act, 25 U.S.C. § 450b.

▮ Of primary significance is the fact that the governmental powers delegated under § 16 of the Indian Reorganization Act were in large part those "powers vested in any Indian tribe or tribal council by existing law." The power to tax both Indians and non-Indians was one of those powers. *Iron Crow v. Oglala Sioux Tribe,* 231

F.2d 89 (8th Cir. 1956). See Cohen, Handbook of Federal Indian Law at 142 (1942). Under these circumstances, particularly when it is recalled that notwithstanding their treaty rights, tribal governments are subject to the plenary power of Congress and so retain only those powers which Congress allows them to retain (*Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903)), it is accurate to describe the Tribes as exercising congressionally delegated power.

▮ Once it has been determined that the Tribes in passing their cigarette ordinances were exercising federally delegated power, it is clear that the application of the State's cigarette tax to non-Indians purchasing cigarettes from Indian retailers on the reservation has been preempted. There is no question but that the tribal taxing ordinances regulate the same subject matter as does the State taxing statute. It is equally clear that the State's statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S. at 67, 61 S.Ct. at 404.

As the nature and scope of the tribal regulatory and taxing scheme has been outlined above, it is necessary only to observe that the Tribes established their cigarette ordinances to accomplish two primary objectives: the regulation of conditions under which cigarettes could be sold to Indians and non-Indians on the reservation, and to generate revenue for essential tribal governmental programs. The revenue generated by the taxes to date has been devoted to the partial funding of programs such as day care, education, nutrition, fire protection and alcoholism of reservation people. The bulk of the revenue derived from the tribal

**20.** *People of State of California v. Quechan Tribe of Indians,* 424 F.Supp. 969 (S.D.Cal. 1977), is not to the contrary. It is true that the Court in *Quechan Tribe of Indians* rejected an argument that the mere existence of a tribal ordinance requiring non-Indians to purchase tribal fishing licenses preempted a state statute regulating on-reservation hunting and fishing by non-Indians. However, there was no indication the tribal ordinance established a compre-

hensive scheme regulating on-reservation hunting and fishing. Moreover, there was no interference with the objectives of the tribal ordinance since the Court found that notwithstanding the state regulation, "[t]he same revenues as have been historically available to the Tribe from the sale of permits will continue to be available if California is allowed to apply its fish and game laws." *Id.* at 976.

taxes comes from sales to non-Indians. The impact of imposing the State's cigarette tax in addition to the tribal tax will not only eliminate the Tribes' competitive advantage but it will give off-reservation retailers a substantial price advantage. Thus, it is not hard to understand why the State conceded that:

> "Assuming that the court finds that the State could require the Tribe and/or its licensed retailers to add the State tax to the sale price of cigarettes sold to non-Indians, *it is painfully apparent that very few, if any, cartons of cigarettes would have been sold.*" (Emphasis added).

Under such circumstances, the objectives of Congress in making the delegation of power and of the Tribes in passing the taxation ordinances for tribal usage would obviously be frustrated. Therefore, the application of the State's tax has been preempted.

In its brief and at final argument, the State urged that to find its cigarette tax invalid would wreak financial disaster upon it as the Tribes would be free to create unlimited tax havens for non-Indians on their reservations. This scenario is unlikely to occur for several reasons. First, there is no preemption absent tribal taxation, and to the extent the Tribes impose their tax, there is no tax haven. Second, to the extent the Tribes are able to generate revenue for needed services, the corresponding burden on the State to supply services may be reduced. Third, the evidence indicates that the Tribes have shown considerable self-restraint in this area and there is no reason to assume they will not continue to do so. For example, there is no evidence that the Tribes have sought to tax non-Indians and thus preempt the State's power to tax in any area other than the sale of cigarettes. Even with regard to the sale of cigarettes, each of the Tribes currently limits sales to non-Indians by its Dealers to three cartons per sale. Accordingly, non-Indians must continue to buy the bulk of their cigarettes from non-Indian retailers and those sales are subject to the State's taxes. Fourth, all ordinances are subject to the approval of the Secretary of Interior and he could be expected to act in the event

of abuse. Fifth, and of singular importance is the plenary power of Congress. It could act at any time to limit or remove any of the legislative powers of the tribal governments.

■ As an alternate ground for relief, we hold that as applied to non-Indians as a result of their on-reservation purchases from Dealers, the State's cigarette taxing scheme constitutes an interference with tribal self-government.

In *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), the Supreme Court considered whether a non-Indian could sue an Indian in state court on a debt arising from a transaction on the reservation. *Williams* teaches that "[e]ssentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Id.* at 220, 79 S.Ct. at 271. Noting that the tribal court had broad civil jurisdiction which covered civil actions against Indians by outsiders, the Court held the state court to be without jurisdiction.

> "There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves. It is immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there." *Id.* at 223, 79 S.Ct. at 272.

The continuing validity of the *Williams* self-government test has been assured by the Supreme Court. *McClanahan,* and *Fisher.*

In this case, both the State and the Tribes seek to tax non-Indians as a result of their on-reservation transactions with Dealers. The impact of superimposing the State's cigarette tax on the tribal taxes has already been discussed in this opinion. However, it bears repeating that at least with regard to a commodity as highly price elastic as cigarettes, the result will be the depletion of an already limited tribal tax base, probable

destruction of the tribal enterprises and elimination of essential revenues needed for tribally sponsored programs.

While not really contesting the probable detriment to the Tribes, the State argues that since it imposes its tax on the non-Indian consumer, the economic impact on the Tribes is indirect and that no matter how deleterious such an impact is, it cannot be deemed an interference with tribal self-government. While this argument is not without force, we find it unpersuasive. The foundation of the State's contention is to be found in its statement that the Tribe's self-government claim "in reality boils down to a claim of intergovernmental immunity." Based on this analysis, they rely heavily on the line of cases beginning with *Helvering v. Mountain Producers Corp.,* 303 U.S. 376, 58 S.Ct. 623, 82 L.Ed. 907 (1938), which establishes the proposition that those dealing with the federal government are not free from state taxation merely because the economic impact of the state tax may be passed on to the federal government. (The same analysis, of course, applies where the federal government seeks to tax those who deal with state governments).

Prior to *Mountain Producers,* with limited exceptions such as *James v. Dravo Contracting Co.,* 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937), court decisions had marked a course of ever widening tax immunity for those dealing with state or federal governments under application of the doctrine of intergovernmental tax immunity. However, that course was reversed in *Mountain Producers. Oklahoma Tax Comm'n v. Texas Co.,* 336 U.S. 342, 364–65, 69 S.Ct. 561, 93 L.Ed. 721 (1949). The trend toward limiting the reach of intergovernmental immunity was continued in cases such as *King & Boozer, Oklahoma Tax Comm'n*; and *United States v. City of Detroit,* 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958).

In *Mountain Producers,* the Supreme Court declared the principle

"that the power to tax should not be crippled 'by extending the constitutional exemption from taxation to those sub-jects which fall within the general application of non-discriminatory laws, and where no direct burden is laid upon the governmental instrumentality, *and there is only remote, if any, influence upon the exercise of the functions of government.'* *Willcuts v. Bunn,* 282 U.S. 216, 225, 51 S.Ct. 125, 75 L.Ed. 304 and illustrations there cited." 303 U.S. at 385, 58 S.Ct. at 627. (Emphasis added).

The Court was led to the declaration of this guiding principle because courts had been granting broad private tax exemptions based on " 'merely theoretical conceptions of interference with the functions of government' " which were "unjustified by actual interfering or destructive effects upon the performance of obligations to or work for the government, state or national." *Oklahoma Tax Comm'n,* 336 U.S. at 363–64, 69 S.Ct. at 573. Examples of this problem were cited by the Court. *Id.* at 363 n. 36, 69 S.Ct. 561.

This Court recognizes and the Tribes concede that any application of the doctrine of intergovernmental tax immunity to Indian Tribes was severely limited in *Mescalero. See also Moe,* 425 U.S. at 481 n. 17, 96 S.Ct. 1634. However, it is equally clear that the limitation on state power established in *Williams* continues unabated. Nevertheless it would be a mistake for the courts to set the same course in applying the *Williams* tribal self-government test as that which prompted the Supreme Court's decision in *Mountain Producers* with respect to the intergovernmental immunity doctrine. This does not mean as the State contends that any state regulation of non-Indians as a result of their on-reservation transactions with Indians will, in the absence of a controlling federal statute, be valid if it results only in an indirect impact on a tribe. Rather, what the courts must avoid is utilizing the *Williams* test to strike down such state regulation based on "merely theoretical conceptions of interference with the functions of [tribal] government." In other words, if a tribe has proved and/or a state concedes that the state regulation causes an actual interference with the per-

formance of the governmental obligations, the courts must, consistent with *Williams,* strike the regulation down.

It is our belief that it was this type of reasoning which the Supreme Court had in mind when in clarifying the *Williams* test, Justice Marshall, writing for the Court in *McClanahan,* stated that the *Williams* test has been applied "principally [to] situations involving non-Indians. . . . In these situations, both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions. The *Williams* test was designed to resolve this conflict by providing that the State could protect its interest up to the point where tribal self-government would be affected." *Id.* 411 U.S. at 179, 93 S.Ct. at 1266.

When viewed with the above principle in mind, our conclusion in this case that the State's tax must be struck down as interfering with tribal self-government is not inconsistent with the Supreme Court's decision in *Moe* or those of the Ninth Circuit in *Fort Mojave Tribe v. San Bernardino County,* 543 F.2d 1253 (9th Cir. 1976), *cert. denied,* 430 U.S. 983 (1977); and *Agua Caliente Band of Mission Indians v. County of Riverside,* 442 F.2d 1184 (9th Cir. 1971), *cert. denied,* 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972). In *Moe,* the cigarettes at issue were sold by individual Indians operating businesses and not by tribal enterprises. There was no indication that the sales of cigarettes were tribally financed, managed or regulated. Although the tribe apparently charged an administrative fee, no tribal tax was imposed on the cigarettes sold in the smoke shops, and the tribe itself received no direct benefits from the cigarette sales upon which it depended as a source of revenue for tribal programs. Thus, in the absence of any direct involvement by the tribe, the Court concluded there was no interference with tribal self-government.

In *Agua Caliente,* the Court of Appeals upheld the imposition of the California Possessory Interest Tax on non-Indian lessees of Indian land. Although the Court granted relief on principles of intergovernmental immunity as applied in *United States v. City of Detroit* rather than the *Williams* test, the result is still largely explainable on the same basis as is *Moe.* The land involved consisted of 1,250 acres which had been leased to non-Indians with the approval of the Secretary of Interior. All but eight acres (99.3%) were leased by individual Indian allottees without tribal involvement. Therefore, as in *Moe,* absent tribal involvement, an indirect economic impact on individual Indians was not sufficient to constitute an interference with tribal self-government. There was, however, tribal involvement with the remaining eight acres (0.7%) as to which the possessory interest tax was also upheld. However, the opinion gives no indication that the economic impact of the possessory interest tax would have destroyed the leasehold value of the tribe's land or that any reduction in income to the tribe as a result of the state's tax would have deprived the tribe of revenues essential for its governmental programs. In addition, there was no comprehensive tribal regulatory and taxing scheme which would have been thwarted.

In *Fort Mojave,* the Court of Appeals reaffirmed the result in *Agua Caliente* while applying the *Williams* test on facts which were superficially similar to those in this case. The Court upheld the imposition of a possessory interest tax on non-Indian lessees of Indian land in spite of the fact that the tribe had also imposed its own tax on the lessees. However, a crucial factual difference between *Fort Mojave* and the instant case is that in *Fort Mojave* the Court was unable to determine the degree to which, if any, the economic burden of the state's tax would have fallen on the tribe. On such facts, the Court was compelled to "hold that the uncertain economic burden here imposed on the tribe's ability to levy a tax does not interfere with their right of self-government." 543 F.2d at 1258. To have done otherwise would have been to disregard the Supreme Court's admonitions that a state's taxing power should not be restricted on "'merely theoretical conceptions of interference with the functions of government.'" *Oklahoma Tax Comm'n,*

336 U.S. at 363, 69 S.Ct. at 573. In contrast, a restriction of the State's taxing power in this case is justified by proof of an actual interference with, if not destruction of, the Tribes' ability to carry out their tax financed self-governing functions. Therefore, we reject the State's contention that *Fort Mojave* controls the result here.[21]

(2) *Motor Vehicle, Mobile Home, Camper and Travel Trailer Excise Taxes:*

■ In addition to their attacks on the State's cigarette taxing scheme, the Tribes contest the application of the State's excise taxation of motor vehicles, R.C.W. 82.44, and mobile homes, camper and travel trailers, R.C.W. 82.50, owned by the Tribes or their enrolled members.[22] Although the motor vehicle and mobile home, camper and travel trailer taxes differ slightly, the State acknowledges they are "in practical operation and effect virtually the same." Each tax is denominated under the applicable statute as an excise tax imposed and assessed annually upon a specified percentage of the fair market value of the vehicle for the privilege of using the vehicle within the state of Washington.

The issue presented has been narrowed by the State's concession that after *McClanahan, Moe,* and *Bryan,* it may not tax mobile homes or vehicles owned by the Tribes or their members which are used exclusively on the reservations. Counsel for the State further assures the Court that it has not only ceased to impose taxes in such situations, but stands ready, willing and able to make refunds on proof of entitlement for such taxes previously imposed.

However, the State, relying on *Mescalero,* contends that *McClanahan* and *Moe* are not controlling to the extent the challenged taxes are imposed for off-reservation use. Under the existing scheme, off-reservation use is presumed (except, apparently, as to mobile homes), and since the amount of tax payable is the same regardless of the extent of vehicle use, the State requires payment of the tax as a condition precedent to the licensing of the vehicle.

Although there is no doubt that *Mescalero* would control if this issue involved use exclusively off the reservation, we do not agree that *Moe* is not controlling on the facts presented here. A review of the District Court's decision in *Moe* reveals that the vehicle use there taxed was use partly on and partly off the Flathead Reservation. *Confederated Salish & Kootenai Tribes v. Montana,* 392 F.Supp. 1325, 1328–29 (D.Mont.1975), aff'd, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (Smith, J., concurring and dissenting). Moreover, the Montana tax invalidated in *Moe* was, except for labeling, identical in operation and effect to the tax here imposed.

■ Rather than disputing the practical similarity between the tax invalidated in *Moe* and that imposed here, the State seeks to distinguish *Moe* on the ground that the tax imposed by Montana was denominated a "personal property tax" while the State's is labeled an "excise" or privilege tax. To be sure, the Supreme Court, at least in governmental immunity cases, has sometimes placed great store in the conceptual differences between property and use or privilege taxes. *E. g., United States v. City*

---

21. In view of our conclusion that the State's cigarette taxing scheme may not be validly applied to sales to non-Indians under the circumstances here present, any steps taken by the State to enforce the tax were also unlawful. Hence, it is not necessary and we do not reach the merits of the Tribes' additional claim that the enforcement measures undertaken by the State are violative of federal law and/or the Constitution of the United States independently of whether the tax itself is valid. For the same reason, it is not necessary and we do not reach the merits of the Tribes' claim that even if the tax may be applied to non-Indians, it may not

also be validly applied to Indians who, though living on the reservation, were not enrolled members of the respective Tribes. However, the latter issue was resolved adversely to the State in No. 3909.

22. The State argues that 28 U.S.C. § 1341 bars this Court from considering these claims to the extent they are asserted on behalf of individual members of the Tribes. After *Moe,* it is clear that an Indian tribe has standing to assert the claims of its members with respect to the validity of state tax laws and that § 1341 does not bar the assertion of such claims by a tribe.

*of Detroit.* Nevertheless the Supreme Court has also expressed its willingness to disregard labels in order to save a "property tax" if the tax was otherwise valid when viewed solely with regard to its "practical operation." *E. g., City of Detroit v. Murray Corp.,* 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441 (1958), and cases cited. *Cf. Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Since the Court eschewed this approach in *Moe,* we can only conclude that it found the tax improper in its practical operation. Inasmuch as there is no difference in practical operation between the two schemes, we hold that the State's motor vehicle and mobile home, camper and travel trailer excise taxes are invalid as applied to reservation situs vehicles which are owned by the Tribes and/or their reservation resident members even though they are used, in part, off the reservation.

### (3) *The State's Assumption of Indian Reservation Jurisdiction* :

The Tribes challenge the State's assumption of Indian jurisdiction pursuant to R.C.W. 37.12 as being violative of federal law and the Constitution of the United States. First, they argue that it violates the terms of congressional consent contained in Pub.L. No. 280 because the State was required and failed to remove a disclaimer of Indian jurisdiction in its constitution, and because partial assumptions of jurisdiction were prohibited. This claim is without merit. The disclaimer issue was presented to the Supreme Court on appeal from an adverse decision in *Makah Indian Tribe v. State,* 76 Wash.2d 485, 457 P.2d 590 (1969), *appeal dismissed,* 397 U.S. 316, 90 S.Ct. 1115, 25 L.Ed.2d 335 (1970). The Supreme Court's dismissal of the appeal as not presenting a substantial federal question is binding on this Court. *Hicks v. Miranda,* 422 U.S. 332, 343–45, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). And it is now also settled that Pub.L. No. 280 does not prohibit partial assumptions of jurisdiction. *Yakima 1.*

Second, the Tribes urge that partial assumption within reservations violates the Equal Protection Clause of the Fourteenth Amendment. In *Yakima 2,* the Court of Appeals held that the State's assumption of partial territorial jurisdiction over the Yakima Reservation pursuant to R.C.W. 37.12.-010 violated the Equal Protection Clause because the distinctions in the statute between trust and nontrust land bore no rational relationship to the statute's purpose of providing law enforcement on the reservation. The entire section of the statute was struck down because the Court found the objectionable portions could not be severed from the remainder. This decision is dispositive of the claims of the Makah and Lummi Tribes because the pattern of jurisdiction on their reservations is based on R.C.W. 37.12.010 and is identical to that on the Yakima Reservation.

However, the pattern of jurisdiction asserted over the Colville Reservation differs from that asserted over the Makah and Lummi Reservations. Acting pursuant to R.C.W. 37.12.021 which expressly requires the consent of the Tribe, the State assumed "total" jurisdiction over the Colville Reservation. It is argued that such action constitutes a denial of equal protection because the abuses inherent in the partial assumption of jurisdiction within a reservation are also present where a state accepts total jurisdiction over some but not all reservations. A review of the discussions in *Yakima 1 and 2* establishes that this argument is without merit.

Alternatively, it is argued that R.C.W. 37.12.021 must be struck down because it is not severable from R.C.W. 37.12.-010. This claim is also without merit. Basically, the remaining provisions of an Act may stand in spite of the unconstitutionality of another portion absent some indication that the legislature would have not enacted them alone and if the remaining provisions can operate independently of the unconstitutional portion. *United States v. Jackson,* 390 U.S. 570, 585, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968); *State v. Anderson,* 81 Wash.2d 234, 236, 501 P.2d 184, 185–86

(1972). In *Yakima 2*, the Court of Appeals found that the invalidation of one aspect of partial jurisdiction would have complicated the enforcement of other aspects. Thus, the Court held the remaining provisions not to be severable and struck R.C.W. 37.12.010 down in its entirety. However, the inability of the State to enforce the partial jurisdiction of R.C.W. 37.12.010 as to nonconsenting tribes in no way inhibits its ability to enforce the full jurisdiction assumed as to consenting tribes under R.C.W. 37.12.021. Further, there is no substantial reason to assume that the legislature would have refused to enact legislation obligating it to assume full jurisdiction over consenting tribes merely because it was unable to constitutionally assert partial jurisdiction over tribes withholding their consent to full jurisdiction.

We finally conclude that judicial economy, convenience, and fairness demand that we retain jurisdiction of the Supremacy Clause issues presented by the Tribes for final adjudication and declare:

(1) The imposition of the State's cigarette taxing scheme under R.C.W. 82.24, the administrative regulations promulgated thereunder, and any enforcement thereof by seizure or otherwise against any of the Tribes or their respective retail dealers are unlawful in that the State's cigarette taxing scheme has been preempted by tribal ordinance and constitutes an unreasonable interference with tribal self-government;

(2) The imposition of the State's tobacco products taxing scheme under R.C.W. 82.26, the regulations promulgated thereunder, if any, and any enforcement thereof as against any of the Tribes or their respective retail dealers are unlawful in that the legal incidence of the tax falls upon the Tribes or their respective retail dealers and results in a direct taxation of Indian income derived from on-reservation activities;

(3) The imposition of the State's motor vehicle excise tax under R.C.W. 82.44 and its mobile home, camper, and travel trailer excise tax under R.C.W. 82.50, the regulations promulgated thereunder, and any enforcement thereof as against any of the Tribes or reservation resident members are unlawful as an infringement of their rights secured under federal statutes and treaties; and

(4) The State's exercise of civil and criminal jurisdiction under R.C.W. 37.12, the regulations promulgated thereunder, and any enforcement thereof against the Lummi or Makah Tribes or any reservation resident members of either Tribe are unlawful as a denial of equal protection under the United States Constitution. However, exercise of similar jurisdiction over the Colville Tribe or any of its reservation resident members does not constitute a violation of the Equal Protection Clause.

Further, we conclude that the Tribes and their respective reservation resident members are entitled to permanent injunctive relief in enforcement of such declarations.

Neither party shall recover costs or attorney fees in these three-judge District Court proceedings.

We deem it expedient and in conservation of judicial time and effort that the issue of the Tribes' recovery of damages, costs and attorney fees therein, if any, resulting from such Supremacy Clause and Fourteenth Amendment infringements should be remanded to single-judge District Court for disposition under further order.

The temporary injunctive relief in favor of the Tribes heretofore issued herein is to remain in force and effect until entry of final judgment herein by this Court.

This decision shall constitute the findings of fact and conclusions of law of this three-judge District Court as required by Fed.R. Civ.P. 52(a).

Counsel for the Tribes is requested to serve and submit within 30 days from the date hereof a proposed final declaratory judgment and decree of permanent restraint in accordance with the foregoing decision.

## CAUSE NO. 3909

*PARTIES*:

The plaintiff is the United States of America for the benefit of the Confederat-

ed Tribes and Bands of the Yakima Indian Nation, and the members thereof (Tribe).

The Confederated Tribes and Bands of the Yakima Indian Nation (also Tribe) intervened as plaintiff under Fed.R.Civ.P. 24.[23]

The defendant is State of Washington (State).

## JURISDICTION :

We note jurisdiction of these causes pursuant to 28 U.S.C. § 1345, 28 U.S.C. § 1362, 28 U.S.C. §§ 2201 and 2202, and 28 U.S.C. § 2281.[24]

## HISTORY OF PROCEEDINGS :

This action was commenced by the filing of the complaint on July 18, 1973, and thereafter the Tribe's motion to intervene was granted. In all other major respects the procedural history parallels that in No. 3868.

## THE TRIBE'S CAUSE :

The Tribe seeks declaratory relief with injunctive enforcement from the State's statutes and administrative regulations imposing taxes and collection procedures upon on-reservation sales to nonmembers of the Tribe by tribally licensed retailers (Dealers) of cigarettes (R.C.W. 82.24), tobacco products (R.C.W. 82.26), and general retail sales (R.C.W. 82.08). In addition, the Tribe seeks damages against the State arising out of actions taken to enforce assessments of the challenged cigarette taxes.

## STATE'S DEFENSE :

The State joins issue with the Tribe's claims.[25]

## FACTS :

### A. Tribe :

The Tribe is a United States Government recognized sovereign Indian tribe and oper-

ates under a governing body approved by the Secretary of Interior. The Yakima Indian Reservation was established by treaty ratified March 8, 1859, 12 Stat. 951, and encompasses approximately 1,390,000 acres in south central Washington. Of the reservation's population of 27,000, about 6,500 are Indians including 1,500 nonmembers of the Tribe. '

### B. State's Taxing Schemes :

#### (1) Cigarette Tax :

The basic aspects of the State's cigarette excise tax were discussed in No. 3868. Further, as in No. 3868, the Tribe has refused and continues to refuse to seek state authorization to possess unstamped cigarettes or to otherwise comply with the statute and regulations promulgated thereunder. Finally, the State has resorted to seizures of unstamped cigarettes in interstate commerce and bound for the Tribe's reservation to enforce assessments of its cigarette tax.

#### (2) Sales Tax :

The other tax which is also a primary subject of dispute in this cause is the State's retail sales tax (R.C.W. 82.08). Under this enactment, the State asserts the right to tax retail sales of goods (including cigarettes) and services by the Tribe and/or its Dealers to nonmembers of the Tribe.

### C. Tribe's Business and Taxing Schemes :

#### (1) Cigarettes :

In essential respects, the Tribe's cigarette and tobacco products retailing and taxation scheme is similar to those adopted by the tribes in No. 3868. The Tribe has passed ordinances providing for the taxation of on-reservation sales of cigarettes and tobac-

---

**23.** Neither the Government's nor the Yakima's standing to bring this cause is disputed.

**24.** See note 1 in No. 3868.

**25.** The State does affirmatively seek relief in the form of a declaratory judgment against the

Tribe. The Tribe contends that such a claim is improper in that it is immune from suit. Although the same issue was settled adversely to the State in No. 3868, all of the issues raised by the State herein may be reached by deciding the claims of the Tribe.

co products by Dealers.[26] These ordinances have been approved by the Secretary of Interior. Pursuant to its ordinances, the Tribe purchases cigarettes from wholesalers outside of Washington which it distributes to tribal members who have been licensed to run seventeen smoke shops on the reservation.

The Tribe derives revenue from the sale of cigarettes in two ways. First, it imposes a "markup" of one cent on each carton sold to its Dealers. A more significant source of revenue is the tax of 22.5 cents on each carton sold by the Dealers. The revenue generated by these sources is substantial; for example, in 1975, the Tribe derived more than $278,000 from them. These monies have been available to partially fund the Tribe's governmental programs for the educational, social, and economic advancement of its members.

As in No. 3868, the competitive advantage enjoyed by the Tribe due to its refusal to impose the State's cigarette tax has resulted in the majority of tribal cigarette sales being made to nonmembers of the Tribe. The stipulations of fact and testimony of Cyril Herrmann[27] establish that superimposing the State's cigarette tax of $1.60 per carton upon tribal sales would have the same impact as it would in No. 3868. That is, the tribal cigarette enterprises would be destroyed, thus eliminating a source of tax revenue upon which the Yakima Tribal Council relies for a substantial amount of its operating capital.

(2) *Other Businesses*:

The Tribe is also engaged in the operation of various noncigarette business enterprises.[28] Although the sales of these businesses are obviously not subject to the State's cigarette excise tax, the State does claim that sales to nonmembers of the Tribe are subject to its retail sales tax. The evidence does not afford a clear picture of what the impact would be of applying the State's retail sales tax to these businesses. The annual sales volume of these businesses is about $2,000,000. However, this figure includes the sales of the timber and land enterprises and those to tribal members which the State does not seek to tax. The stipulations of fact are unenlightening on this point. They merely show that the "sales [of these enterprises] are at economic value and if State excise taxes are paid on these sales it will reduce the income of the Yakima Tribe . . . ." The testimony of Herrmann, the Tribe's economic expert, is equally unavailing. With regard to the Tribe's noncigarette enterprises, he was questioned only as to the furniture manufacturing operation. And even there, his analysis of the impact of imposing the State's retail sales tax upon the furniture business was sketchy and not based on a review of the business records. Thus, it cannot be said with certainty that the Tribe could not offset an increase in costs from the application of the State's retail sales tax by somehow reducing production and/or marketing costs. Furthermore,

**26.** However, in contrast to No. 3868 there is no evidence in this cause that the Dealers are federally licensed Indian Traders.

**27.** The deposition of Cyril Herrmann was taken by the Tribe and has been admitted into evidence. Herrmann received a Ph.D in economics from Harvard University in 1953. He taught marketing at the Massachusetts Institute of Technology for six years and is presently Western Regional Vice-President of Arthur C. Little, Inc., a large diversified consulting and research company. Herrmann based his opinions on his education and experience in market analysis and upon the information he obtained from his visitation to and discussions at the Yakima reservation. His qualifications as an expert are not disputed by the State.

**28.** Among the business enterprises owned and operated by the Tribe on the reservation, the sales of which the State claims are properly subject to its sales tax, are furniture, boat and housing unit component manufacturing, Indian arts and crafts, fish and food processing and newspaper distributing. The State does not now assert the authority to similarly tax the sales of the Tribe's land and timber enterprises. The Tribe also owns an aircraft sales, charter and service business which is operated as a corporation off the reservation. The Tribe does not dispute its liability for state taxes applicable to the operation of this business.

even if the Tribe was unable to offset such cost increases, it is not clear that the economic viability of the furniture enterprise would be destroyed.

Finally, there is no evidence that the Tribe has adopted any ordinance regulating and taxing the noncigarette business enterprises.

### DISCUSSION:

The claims presented by the parties in this cause are at the same time more limited and more extensive than those presented in No. 3868. First, the Tribe does not attack the State's assumption of Indian jurisdiction, since they successfully litigated that issue in *Confederated Bands and Tribes of Yakima Indian Nation v. Washington*, 552 F.2d 1332 (9th Cir. 1977). Neither does the Tribe present any challenge to the State's statutes providing for excise taxes on motor vehicles, campers, travel trailers and mobile homes, nor does it dispute the scope of this three-judge District Court's jurisdiction. Second, the contentions are more extensive in this action since, in addition to challenging the validity of the State's cigarette and tobacco products taxes as applied to on-reservation sales by Dealers to nonmembers of the Tribe, the Tribe also contests the validity of the State's retail sales tax as applied to the sales of the cigarette and other business enterprises operated by the Tribe on the reservation.

### CIGARETTE TAX ISSUES:

Basically, the same arguments are raised both for and against the validity of the State's cigarette and tobacco products excise taxes as were raised in No. 3868. Since there are no essential factual differences between the cases, the resolution of the cigarette and tobacco products tax claims in this cause is susceptible to the same analysis as was applied in No. 3868. We conclude that judicial economy, convenience, and fairness demand that we retain jurisdiction of the Supremacy Clause issues presented by the Tribe for final adjudication and declare, as we did in No. 3868:

(1) The imposition of the State's cigarette taxing scheme under R.C.W. 82.24, the administrative regulations promulgated thereunder, and any enforcement thereof by seizure or otherwise against the Tribe or its Dealers are unlawful in that the State's cigarette taxing scheme has been preempted by tribal ordinance and constitutes an unreasonable interference with tribal self-government; and

(2) The imposition of the State's tobacco products taxing scheme under R.C.W. 82.26, the regulations promulgated thereunder, if any, and any enforcement thereof against the Tribe or its Dealers are unlawful in that the legal incidence of the tax falls upon the Tribe or its Dealers and results in a direct taxation of Indian income derived from on-reservation activities.

### SALES TAX ISSUES:

Although we were not directly faced with the validity of an application of the State's sales tax to on-reservation tribal sales in No. 3868, the principles of preemption and tribal self-government underlying the resolution of this question were discussed therein. Therefore, only an abbreviated discussion is necessary to explain the basis for our holdings below. In view of the underlying facts, the sales tax question is best discussed in two analytical segments: (A) As it applies to cigarette sales; and (B) As it applies to the on-reservation sales of goods and services of the Tribe's noncigarette businesses.

### A. *Application to Cigarette Sales:*

The application of the Sale's sales tax to tribal cigarette sales would result in a price increase of about two cents per package or roughly twenty cents per carton. Such an increase would, of course, decrease the differential between the price charged by tribal and that charged by nontribal retailers. Since cigarettes are highly price elastic, even a small change in price can cause a significant change in sales. However, even if compelled to add the State's sales tax, Dealers would still be left with a price advantage of approximately

eight cents per package or eighty cents per carton.[29] Although we find that the application of the State's sales tax to tribal cigarette sales would cause a decrease in cigarette sales to non-Indians and thereby reduce tribal tax revenues, we cannot find that the decrease would be of sufficient magnitude to destroy cigarette sales as a source of tribal tax revenue and thereby work an actual interference with tribal self-government. Accordingly, we conclude and hold that such an application of the State's sales tax would not adversely affect tribal self-government.

This conclusion does not end the inquiry since the Tribe also contends that application of the State's sales tax to tribal cigarette sales has been preempted. The tribal ordinance placing a tax upon cigarettes sold by Dealers and the application of the State's sales tax to such cigarette sales clearly touch on the same subject matter. It is equally clear that the Tribe intended in enacting its cigarette taxing ordinance to maximize tribal tax revenue from the sale of cigarettes. Moreover, superimposing the State's sales tax on tribal cigarette sales would substantially decrease the Tribe's cigarette tax revenue. Thus, we find that such an application of the State's sales tax would frustrate the Tribe's objective in passing its ordinance and we hold and declare that the application of the State's sales tax to tribal cigarette sales to non-Indians has been preempted and that any attempted enforcement thereof or regulations promulgated thereunder are unlawful.

B. *Application to Sales Attributable to the Tribe's Other Businesses:*

The Tribe also contends that the State may not apply its sales tax to sales made to non-Indians by the Tribe's noncigarette enterprises. However, this contention must be rejected since the Tribe has failed to carry its burden of proving either that such an application of the State's sales

tax has been preempted or that it would interfere with tribal self-government. The absence of any tribal ordinance touching the same subject matter as does the challenged state statute precludes a conclusion that there has been a preemption. The tribal self-government argument must fail because the Tribe did not produce evidence that the application of the State's sales tax would destroy the revenue generating potential of its various businesses. The most that the evidence shows is that there would be some uncertain reduction in income to the Tribe. This is clearly insufficient to establish an interference with tribal self-government. *Fort Mojave Tribe v. County of San Bernardino*, 543 F.2d 1253 (9th Cir. 1976), *cert. denied*, 430 U.S. 983 (1977).

Having concluded that the State may properly apply its sales tax to on-reservation noncigarette business transactions involving non-Indians, we are faced with further disputes as to who falls within the category of non-Indians and as to whether the State's sales tax enforcement scheme may be lawfully applied to tribal retailers.

While the State concedes that it may not lawfully apply its sales tax to members of the Tribe, it asserts that it may lawfully tax Indians who are not members of the Tribe. The State has sought to achieve this result by limiting the definition of the term "Indian" in Rule 192 to "persons duly registered on the tribal rolls of the Indian tribe occupying an Indian reservation." Thus, all nonmembers of the Tribe are categorized as non-Indians and deemed subject to taxation. A similar contention was rejected by the District Court in *Confederated Salish & Kootenai Tribes v. Moe*, 392 F.Supp. 1297, 1312 (D.Mont.1975), *aff'd*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), and we agree with the view expressed there that all Indians residing on a reservation are equally free from the

---

**29.** Cigarettes sold by Dealers which are not subject to state taxes sell for about $3.95 per carton. The current rate of the State's sales tax is 5.1 percent of the retail sales price. In contrast, cigarettes sold by nontribal retailers to nonmembers of the Tribe sell for about $5.00 per carton. This price reflects $1.60 which is attributable to the State's cigarette excise tax and $0.24 which is attributable to its sales tax.

State's excise taxation regardless of whether they are members of the tribe.[30]

In addition to challenging the validity of the State's sales tax as applied, the Tribe contests the State's enforcement scheme. It argues that the State may not lawfully require the Tribe's noncigarette retailers to register with the Department of Revenue, collect and remit applicable taxes, or to keep records pertaining to taxable and nontaxable transactions.[31] This claim is based on the contention "that the State has no police power or regulatory power over the Yakima Nation and/or its retailers regarding these on reservation transactions." The Tribe further contends that the Supreme Court's decision in *Moe* is of no assistance in resolving this issue since "none of these burdensome duties were required of the Indian retailer [in *Moe*]."

■ We do not find that *Moe* is so easily distinguished. There the Supreme Court specifically approved a requirement that the Indian retailer collect and remit to the state the excise tax applicable to on-reservation sales to non-Indians. 425 U.S. at 483, 96 S.Ct. 1634. Montana had not attempted to assume civil taxing authority over reservation Indians pursuant to the Act of August 15, 1953, Pub.L. No. 83–280, Ch. 505, 67 Stat. 588–90, 392 F.Supp. at 1306, and it is now clear that any attempt to have done so would have been futile.

*Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). Thus, in upholding the collection requirement in *Moe,* the Supreme Court approved the exercise by a state of some regulatory power over reservation Indians if related to their on-reservation transactions with non-Indians. Of course, in the exercise of that power, a state may impose only those burdens which have not been preempted and which do not constitute an interference with tribal self-government. 425 U.S. 483, 96 S.Ct. 1634. This rule protects the states' interest in ensuring the collection of taxes validly imposed upon non-Indians while also minimizing the impact on Indians.

■ When viewed against the above standard, it is clear that the State's collection and registration requirements are valid. The collection requirement imposed pursuant to R.C.W. 82.08.050 requires no more than the simple act specifically approved in *Moe.* The Tribe correctly points out that the Supreme Court did strike down Montana's vendor licensing statute as applied to Indian retailers and contends that a similar result is, therefore, required here.

The statute attacked in *Moe* required the payment of a license fee as a prerequisite in doing business. It, therefore, imposed a tax upon the Indian retailer and could not stand absent congressional consent. *Moe,* 425

---

**30.** The District Court in *Moe* noted that "different rules may apply 'where Indians have left the reservation and become assimilated into the general community.'" 392 F.Supp. at 1312 n.22 quoting *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 171, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). However, unlike in *Moe,* the State has not asserted that it may tax Indians who reside off the reservation, and we do not reach that question. The definition of "Indian" in Rule 192 makes no distinction between residents and nonresidents of a tribe's reservation. A transaction's susceptibility to taxation is made solely a function of whether the person taxed is an "Indian" and where the sale or delivery of a purchased item occurs. If the buyer is an Indian and the sale or delivery occurs on the reservation, the transaction is deemed nontaxable, whereas if both occur off the reservation, it is deemed taxable.

**31.** This is one of two so-called "enforcement issues." The other relates to whether the State

may lawfully enforce its sales tax by engaging in seizures of Indian property on and/or off the reservation. We do not reach this question because any adjudication of it at the present time would be premature. First, the history of enforcement by seizure relates exclusively to the seizure of cigarettes as a means of enforcing the State's cigarette tax which we have held to be invalid. There is no factual development or indication as to whether or, if so, how the State would attempt to enforce its sales tax by seizure. Second, the briefing and argument, both in this cause and No. 3868, were developed exclusively with respect to enforcement of the cigarette tax. Finally, we have no reason to believe the Tribe will not abide by this Court's decision that the State may lawfully impose its sales tax on sales to non-Indians in its noncigarette enterprises. Assuming that to be the case, the State would have no occasion to resort to enforcement by seizure.

U.S. at 475–80, 96 S.Ct. 1634. In contrast, the State here imposes only a registration requirement; no fee is imposed upon the Indian retailer. As with the collection requirement "this burden is not, strictly speaking, a tax at all, [and] is not governed by the language of *Mescalero [Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973)] dealing with the 'special area of state taxation.'" *Moe,* 425 U.S. at 483, 96 S.Ct. at 1646. Since the one-time registration requirement is even less burdensome than the collection requirement, it follows that it may be lawfully imposed on Indian retailers doing business with non-Indians.

The Tribe also contests the record keeping requirements which the State has imposed on Dealers with respect to taxable and nontaxable transactions. R.C.W. 82.-08.070 requires each seller to make out a monthly return "setting forth the amount of all sales, nontaxable sales, taxable sales, the amount of the tax thereon, and such other information as the department [of Revenue] shall require . . .." Further, Rule 192 and E.T.B. 504.08.192 require Indian retailers to keep additional specified records solely with respect to nontaxable transactions.

■ Since the State's power to regulate Indian retailers is no more than an adjunct of its power to tax non-Indians, any exercise of that power would obviously have to be reasonably necessary to ensure payment of taxes imposed on non-Indians, and the State does not contend otherwise. There is, however, no evidence in the record as to whether the record keeping requirements, as promulgated, are or are not reasonably necessary to ensure payment of lawful taxes. In requiring that records be kept which pertain directly to taxable transactions (e. g., the number and dollar volume of sales to non-Indians), the State is merely venturing into an area in which it has recognized, albeit very limited, power. Such regulations are presumed reasonably necessary and the Tribe has failed to carry its burden to prove the contrary.

■ On the other hand, in requiring that records be kept as to nontaxable sales (*i. e.,* sales to Indians), the State is placing a burden upon Indian retailers with respect to transactions over which it normally would have no power and which pertains only indirectly to taxable sales. Hence, in such situations the State has the burden to prove that the regulation is reasonably necessary to ensure payment of taxes which it does have power to impose. In its brief, the State argues that it is the opinion of "the professional tax administrators of the Department of Revenue" that the information required about nontaxable sales by Rule 192 and E.T.B. 504.08.192 is necessary to create an "audit trail" to prevent fraudulent tax avoidance. However, the State has offered no evidence, by stipulation or otherwise, to support this contention. Accordingly, we hold and declare that the State may not impose the requirement that the Tribe's noncigarette retailers keep records of nontaxable transactions.

Finally, we conclude that the Tribe is entitled to a declaratory judgment in conformity with the foregoing declarations in this opinion and to permanent injunctive relief in enforcement thereof.

Neither party shall recover costs or attorney fees in these three-judge District Court proceedings.

We deem it expedient and in conservation of judicial time and effort that the issue of the Tribe's recovery of damages, costs and attorney fees therein, if any, resulting from such Supremacy Clause infringements should be remanded to a single-judge District Court for disposition under further order.

The temporary injunctive relief in favor of the Tribe heretofore issued herein is to remain in force and effect until entry of final judgment herein by this Court.

This decision shall constitute the findings of fact and conclusions of law of this three-judge District Court as provided by Fed.R. Civ.P. 52(a).

Counsel for the Tribe is requested to serve and submit within 30 days from the

date hereof a proposed final declaratory judgment and decree of permanent restraint in accordance with the foregoing decision.

KILKENNY, Circuit Judge, concurring and dissenting:

I commend Judge East on his excellent analysis of the problems before us and only regret that I am unable to concur fully. I dissent only in his conclusions that the tribal cigarette ordinances preempted the field and that the state of Washington had no authority to collect its cigarette tax, and the accompanying sales tax on cigarette sales, even as to non-Indian purchasers.

While Judge East is convinced that the cases of *Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976), and *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), are controlling and dispositive of this issue, I am just as convinced that these cases are distinguishable and that *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), and *Fort Mojave Tribe v. San Bernardino County,* 543 F.2d 1253 (CA 9 1976), cert. denied 430 U.S. 983, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977), are controlling and that the cigarette and sales taxes on purchases by non-Indians should be upheld.

*Fisher* involved a dispute between two Indians on whether the state of Montana or the Indian Tribal Court had exclusive jurisdiction of an adoption proceeding. There, the Court emphasized that the dispute arose on a reservation, entirely among Indians, and went on to say that to allow any court other than an Indian court jurisdiction would cause a corresponding decline ". . . in the authority of the Tribal Court." Here, the issue arises on Indian land, but non-Indians, as well as Indians are involved. The tax here will not be levied against Indians. In *Fisher,* the Court relied heavily on an agreement between the Indian tribe and the United States and the adoption by the tribe of a Constitution and By-Laws pursuant to the Indian Reorganization Act, 48 Stat. 987, a statute specifical-

ly intended to encourage Indian tribes to revitalize their self-government. Acting pursuant to this Constitution and By-Laws, the Northern Cheyenne Tribal Council established a Tribal Court and granted it jurisdiction over adoptions "among members of the Northern Cheyenne Tribe." There the Court held that the state court jurisdiction plainly would interfere with the powers of the self-government conferred upon the Northern Cheyenne Tribe and encouraged by federal legislation. Moreover, it would subject a dispute arising on the reservation among reservation Indians to a forum other than their own. The Court went on to say that no federal statute sanctioned this type of interference with tribal self-government. From there the Court concluded that since the adoption proceeding was appropriately characterized as litigation arising on the Indian reservation, the jurisdiction in the Tribal Court was exclusive. There is no similarity between the facts in *Fisher* and those on the record before us and nothing that is said by the *Fisher* Court is in any way relevant to our record.

In *Williams,* the respondent Lee, a non-Indian, operated a general store on the Navajo Reservation in Arizona under a license required by federal statute. He instituted an action in the superior court of Arizona against Williams, a Navajo Indian and his wife, who lived on the reservation, to collect for goods sold to them on credit. The Arizona trial court granted judgment in favor of Lee. The Arizona Supreme Court affirmed and the Supreme Court accepted *certiorari.* The Supreme Court placed considerable emphasis on Arizona's refusal to accept jurisdiction over Indians pursuant to a congressional enabling act. Obviously, the Court felt that because Arizona had chosen not to accept that responsibility it would be anomalous to allow it to assert jurisdiction over a subject matter on which the Tribal Courts would have full power to act. Here, the state of Washington has completely assumed the congressionally authorized jurisdiction over Indians.

Furthermore, the *Williams* Court, like *Fisher,* based its preemption analysis on the strong federal policy of the Indian Reorganization Act to encourage revitalization of tribal self-government. Since the majority has rejected any claim that the tax is prohibited by the Indian Reorganization Act, its reliance on *Williams* and *Fisher* is further weakened. Additionally, the *Fort Mojave* opinion lends support to the concept that matters of Tribal Court jurisdiction merit special preemption consideration. In distinguishing the *Williams* decision on this jurisdictional rationale, this court wrote:

"The interference with Indian self-government in the instant case is much less serious. No Indian or Indian land is being subjected to direct *state court process.*" *Id.* at 1258. [Emphasis supplied].

Clearly, both *Fisher* and *Williams* go to jurisdictional issues of state v. Indian courts. Here, there is no such dispute. Rather, the only issue here is the validity of the cigarette and sales taxes as applied to non-Indian purchasers. Consequently, *Fisher* and *Williams* cannot be deemed controlling.

It is my considered judgment that *Moe v. Confederated Salish & Kootenai Tribes, supra,* is controlling on our facts. To me, *Moe* settles the question of when and under what circumstances the cigarette tax may be collected on an Indian reservation. *Moe* involved a challenge by the Indian tribe and some of its members to Montana's cigarette sales taxes and personal property taxes on motor vehicles as applied to reservation Indians and also to the state's vendor licensing statute as applied to tribal members who sell cigarettes at smoke shops on the reservation. Relying upon *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), and *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), the Supreme Court in *Moe* held that the vendor license fee tax on personal property located within the reservation, as applied to a reservation Indian conducting a cigarette business *for the tribe* on reservation land and the cigarette tax as applied to on-reserva-tion sales by Indians to Indians, would conflict with applicable federal statutes. In so holding, the Supreme Court likened the rights of the tribal members to those of the tribe itself. The Court then went on to hold that the tax immunity for reservation Indians did not constitute invidious racial discrimination against non-Indians contrary to the equal protection clause of the Fifth Amendment. However, the Court limited its decision by requiring the cigarette taxes to be levied on cigarettes sold to non-Indians by on-reservation smoke shops. Moreover, the *Moe* Court held that the Indian proprietor could be obligated to add the tax to the cigarette sales price and thereby aid the state's tax collection and enforcement. In so holding, the Court emphasized the minimal burden in tax collecting, and that in its absence non-Indians purchasing from the tribal seller would escape payment of a lawful tax. *Moe* rejected the contention that the tax frustrated tribal self-government or conflicted with federal statutes dealing with reservation Indian affairs.

Judge East attempts to distinguish *Moe* from the case before us by arguing that in *Moe* there was no tribal management, financing, or regulation. A careful consideration of the extent of tribal involvement both here and in *Moe* demonstrates the cases' overall similarity. The majority, in my opinion, has extended tribal preemption to unprecedented heights.

The district court opinion in *Moe* fully described the extent of tribal involvement in the regulation of cigarettes.

"The land is leased from the Tribes upon the Tribal Council's approval of the lessee's plan to erect a smoke shop. The Council controls the purchase of cigarettes for resale by Tribal members and charges an administrative fee in connection therewith." *Confederated Salish & Kootenai Tribes of the Flathead Reservation, Montana v. Moe,* 392 F.Supp. 1297, 1313 (D.Mont.1975).

This is to be likened to the majority's recitation of the Confederated Tribes' regulations. It quickly becomes apparent that the only meaningful difference between the ex-

tent of tribal involvement in the two cases is the Confederated Tribes' decision to levy a tax on cigarettes. The mere imposition of a tribal tax does not rise to the level of a preemption of the taxing field on that article. As this court noted in *Fort Mojave Tribe v. San Bernardino County, supra,*

"The only effect of the tax on the Indians will be the indirect one of perhaps reducing the revenues they will receive from the leases as a result of their inability to market a tax exemption. Such an indirect economic burden cannot be said to threaten the self-governing ability of the tribe." *Id.* at 1258.

Of further significance, is the fact that *Moe* speaks of the tribe's rights and involvement rather than voicing similar concerns on behalf of the individual smoke shop dealers. I quote from the opinion:

"The tribe would carry these cases significantly further than we have done, however, and urges that the state cannot impose its cigarette tax on sales by Indians to non-Indians because '[i]n simple terms, [the Indian retailer] has been taxed, and . . . has suffered a measurable out-of-pocket loss.' But this claim ignores the District Court's finding that 'it is the non-Indian consumer or user who saves the tax and reaps the benefit of the tax exemption.'"

\* \* \* \* \* \*

"Without the simple expedient of having the retailer collect the sales tax from non-Indian purchasers, it is clear that wholesale violations of the law by the latter class will go virtually unchecked." 425 U.S. 481–482, 96 S.Ct. 1645.

The *Moe* court then says:

"The *Tribe* asserts that to make the Indian retailer an 'involuntary agent' for collection of taxes owed by non-Indians is a 'gross interference with [its] freedom from state regulation . . ..'" 425 U.S. at 482, 96 S.Ct. at 1645. [Emphasis supplied].

and then concludes:

"The State's requirement that the Indian tribal seller collect a tax validly imposed on non-Indians is a minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax. . . . We see nothing in this burden which frustrates tribal self-government . . .." 425 U.S. at 483, 96 S.Ct. at 1646.

In my opinion, this language of the *Moe* Court completely answers the majority's view that the imposition of the tax in the instant case frustrates tribal self-government.

Another authority which is closely akin and of controlling importance is *Fort Mojave Tribe v. County of San Bernardino, supra.* There, the county levied a possessory interest tax on non-Indian lessees of land held in trust by the government for the Fort Mojave Indian Tribe. The court determined that the imposition of this type of tax on non-Indian lessees did not violate the Indian Reorganization Act and was not invalid as being an infringement upon the tribe's right to govern itself. The court also held that the imposition of such a tax by both the Fort Mojave Indian Tribe and the California county on non-Indian lessees of Indian land did not result in improper double taxation. In *Fort Mojave,* the tribe itself imposed a tax on the lease. Here, the tribe itself imposed a tax on the cigarettes. In discussing this "double taxation" issue, the *Fort Mojave* court found no improper double taxation since the taxes were being imposed by two different and distinct taxing authorities and concluded that the uncertain economic burden there imposed on the tribe's ability to levy a tax did not interfere with its right of self-government. We note that the *Fort Mojave* court made full use of the Supreme Court decision in *Moe* in arriving at its own conclusion.

Despite what is said by the majority, I find nothing in the record to support Judge East's conclusions that the tribe has preempted, or even attempted to preempt, the entire field of taxation on Indian reservations. Because the state of Washington can lawfully impose its cigarette tax it follows that the state may also collect its authorized sales tax on cigarette purchases by non-Indians. The majority would find such tax-

es preempted by tribal regulations. I dissent based on my analysis in the foregoing opinion.

I would hold that the state of Washington can validly impose the cigarette and sales tax in question and require the licensed dealers to account for the tax on all sales to non-Indians, keeping an adequate record of such sales. Because the tax, in my opinion, is legal, it follows that some type of a record must be kept.

I purposely have not spoken with regard to the majority's conclusion that the state of Washington may not impose its personal property tax on automobiles owned by Indians living on the reservation. The record before us is totally inadequate and insufficient to consider a tax that falls precisely in between the totally on-reservation activity in *McClanahan* and the totally off-reservation activity in *Mescalero.*